# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

-------------------------------------------------------------- **x**

THE DEMOCRATIC PARTY OF WISCONSIN;
COLLEEN ROBSON; ALEXIA SABOR; PETER
KLITZKE; DENIS HOSTETTLER, JR.; DENNIS
D. DEGENHARDT; MARCIA STEELE; NANCY
STENCIL; and LINDSAY DORFF,

Civil Action No. 3:19-CV-00142-slc

*Plaintiffs*,

v.

ROBIN VOS, in his official capacity as speaker of the
Wisconsin State Assembly; SCOTT L.
FITZGERALD, in his official capacity as majority
leader of the Wisconsin State Senate; ALBERTA
DARLING, in her official capacity as co-chair of the
Wisconsin Joint Committee on Finance; JOHN
NYGREN, in his official capacity as co-chair of the
Wisconsin Joint Committee on Finance; ROGER
ROTH, in his official capacity as President of the
Wisconsin State Senate; JOAN BALLWEG, in her
official capacity as co-chair of the Wisconsin Joint
Committee for Review of Administrative Rules;
STEPHEN L. NASS, in his official capacity as co-
chair of the Wisconsin Joint Committee for Review of
Administrative Rules; JOEL BRENNAN, in his
official capacity as Secretary of the Wisconsin
Department of Administration; TONY EVERS, in his
official capacity as Governor of the State of
Wisconsin; and JOSHUA L. KAUL, in his official
capacity as Attorney General of the State of
Wisconsin,

*Defendants*.

----------------------------------------------------------

## BRIEF IN SUPPORT OF LEGISLATIVE DEFENDANTS' MOTION TO DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

ARGUMENT ........................................................................................................... 9

    I.      This Court Should Dismiss Plaintiffs' Complaint ................................. 9

          A.     Plaintiffs Lack Article III Standing To Complain About The Loss Of Power Suffered By Third-Party State Officials ................................. 10

          B.     Plaintiffs' Lawsuit Is Entirely Foreclosed By Several Binding Lines Of Precedent, Especially The Political Questions Caselaw ........... 14

          C.     Plaintiffs' Lawsuit Also Fails As A Matter Of Law On The Merits ....... 23

    II.     This Court Should Deny Plaintiffs' Motion For A Preliminary Injunction ......... 28

          A.     Plaintiffs Have No Likelihood Of Success On The Merits..................... 28

          B.     Plaintiffs Have Failed To Establish Irreparable Harm, And, In Any Event, An Injunction Would Do Far More Harm Than Good To The Public Interest ................................................................................. 29

CONCLUSION...................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983)....................................................................................22

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).....................................................................................9

*Bailey v. Callaghan,*
   715 F.3d 956 (6th Cir. 2013) ......................................................................21

*Baker v. Carr,*
   369 U.S. 186 (1962)....................................................................................16

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).....................................................................................9

*Bible v. United Student Aid Funds, Inc.,*
   799 F.3d 633 (7th Cir. 2015) .......................................................................9

*Books v. Elkhart Cty., Ind.,*
   401 F.3d 857 (7th Cir. 2005) ................................................................11, 12

*Branti v. Finkel,*
   445 U.S. 507 (1980)....................................................................................22

*Ohio ex rel. Bryant v. Akron Metro. Park Dist.,*
   281 U.S. 74 (1930)......................................................................................16

*Bush v. Gore,*
   531 U.S. 98 (2000)......................................................................................22

*California Democratic Party v. Jones,*
   530 U.S. 567 (2000)....................................................................................22

*Citizens United v. Fed. Election Comm'n,*
   558 U.S. 310 (2010)....................................................................................22

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985)....................................................................................22

*Colegrove v. Green,*
   328 U.S. 549 (1946)....................................................................................16

*U.S. Dep't of Agriculture v. Moreno*,
  413 U.S. 528 (1973) .................................................................................22

*Egan v. Del. River Port Auth.*,
  851 F.3d 263 (3d Cir. 2017) ....................................................................28

*Forsyth v. City of Hammond*,
  166 U.S. 506 (1897) .................................................................................16

*Frank v. Walker*,
  768 F.3d 744 (7th Cir. 2014) ...................................................................21

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ...............................................................10, 11, 12

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of
  America Inc.*,
  549 F.3d 1079 (7th Cir. 2008) .................................................................28

*Guitierrez-Brizuela v. Lynch*,
  834 F.3d 1142 (10th Cir. 2016) ...............................................................28

*Harper v. Virginia Bd. of Elections*,
  383 U.S. 663 (1966) .................................................................................22

*Hearne v. Bd. of Education of City of Chicago*,
  185 F.3d 770 (7th Cir. 1999) .............................................................20, 21

*Helgeland v. Wis. Municipalities*,
  2006 WI App. 216, 296 Wis. 2d 880, 724 N.W.2d 208 ...........................4

*Heller v. Doe*,
  509 U.S. 312 (1993) .................................................................................23

*In re Hubbard*,
  803 F.3d 1298 (11th Cir. 2015) ...............................................................21

*I.N.S. v. Chadha*,
  462 U.S. 919 (1983) ...........................................................................18, 26

*Int'l Union, UMWA v. MSHA*,
  407 F.3d 1250 (D.C. Cir. 2005) ...............................................................27

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) .................................................................................14

*Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*,
  684 F.3d 462 (4th Cir. 2012) ...................................................................21

*Largess v. Supreme Judicial Court,*
    373 F.3d 219 (1st Cir. 2004)..............................................................17

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006).....................................................................20

*Lewis v. Casey,*
    518 U.S. 343 (1996)................................................................10, 14

*Libertarian Party of Illinois v. Scholz,*
    872 F.3d 518 (7th Cir. 2017) ...........................................................22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...........................................................10, 11, 12

*Luther v. Borden,*
    48 U.S. (7 How.) 1 (1849) .........................................................15, 17

*MainStreet Org. of Realtors v. Calumet City,*
    505 F.3d 742 (7th Cir. 2007) ...........................................................10

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803)........................................................1, 12

*Martinez v. DILHR,*
    165 Wis. 2d 687, 478 N.W.2d 582 (1992)..........................................18, 26

*Mayor of City of Phila. v. Educ. Equality League,*
    415 U.S. 605 (1974).......................................................................15

*Miami Nation of Indians of Indiana, Inc. v. U.S. Dep't of the Interior,*
    255 F.3d 342 (7th Cir. 2001) ...........................................................14

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015)...................................................................28

*Minor v. Happersett,*
    88 U.S. 162 (1875)........................................................................16

*Mountain Timber Co. v. Washington,*
    243 U.S. 219 (1917)......................................................................16

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964).......................................................................22

*New York v. United States,*
    505 U.S. 144 (1992)......................................................................16

*Nixon v. United States*,
    506 U.S. 224 (1993)................................................................................................14

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)............................................................................................26, 27

*O'Neill v. Leamer*,
    239 U.S. 244 (1915)................................................................................................16

*Pac. States Tel. & Tel. Co. v. Oregon*,
    223 U.S. 118 (1912)................................................................................................16

*Perry v. Village of Arlington Heights*,
    186 F.3d 826 (7th Cir. 1999) ..................................................................................10

*Reynolds v. Sims*,
    377 U.S. 533 (1964)................................................................................................22

*Risser v. Thompson*,
    930 F.2d 549 (7th Cir. 1991) ...................................................................... *passim*

*State v. City of Oak Creek*,
    232 Wis. 2d 612, 605 N.W.2d 526 (2000)........................................................18, 24

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)................................................................................................27

*Tetra Tech EC, Inc. v. Wisconsin Dep't of Revenue*,
    2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21 ........................................................8

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017)......................................................................................10, 14

*Travis v. Reno*,
    63 F.3d 1000 (7th Cir. 1998) ..................................................................................16

*United States v. Windsor*,
    570 U.S. 744 (2013)................................................................................................25

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004)....................................................................................9, 10, 19, 20

*Waterkeeper Alliance v. EPA*,
    853 F.3d 527 (D.C. Cir. 2017)................................................................................28

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ................................................................................28

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ............................................................................22

*Wis. Educ. Ass'n Council v. Walker*,
   705 F.3d 640 (7th Cir. 2013) ....................................................21, 23

**Constitutional Provisions**

U.S. Const. amend. I ................................................................... *passim*

U.S. Const. amend. XIV, § 1 ...................................................... *passim*

U.S. Const. art. III ...................................................................... *passim*

U.S. Const. art. IV, § 4 ............................................................... *passim*

**Statutes**

2017 Wisconsin Act 369 ............................................................. *passim*

2017 Wisconsin Act 370 ............................................................. *passim*

Judiciary Act of 1801, 2 Stat. 89 .....................................................1, 12

National Emergencies Act, Pub. L. 94–412, 90 Stat. 1255 .................1, 12

Wis. Stat. § 5.02 ...................................................................................7

Wis. Stat. § 5.05 ...................................................................................7

Wis. Stat. § 6.22 ...................................................................................7

Wis. Stat. § 6.24 ...................................................................................7

Wis. Stat. § 6.25 ...................................................................................7

Wis. Stat. § 6.276 .................................................................................7

Wis. Stat. § 6.34 ...................................................................................7

Wis. Stat. § 6.855 .................................................................................7

Wis. Stat. § 6.865 .................................................................................7

Wis. Stat. § 6.87 ...................................................................................7

Wis. Stat. § 6.88 ...................................................................................7

Wis. Stat. § 6.97 ...................................................................................7

WIS. STAT. § 7.15 ........................................................................................7

WIS. STAT. § 20.940 .....................................................................................5

WIS. STAT. § 165 ...................................................................................3, 4, 24

WIS. STAT. § 227 ......................................................................................8, 13

WIS. STAT. § 601 .........................................................................................6

## Other Authorities

2 SAMUEL J. JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (8th ed. 1786) ...................17

4 EPHRAIM CHAMBERS, CYCLOPEDIA OR AN UNIVERSAL DICTIONARY (1783)...........................17

FRANCIS ALLEN, A COMPLETE ENGLISH DICTIONARY (1765) .......................................17

JOHN ASH, A NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1775)...................................................................................17

NICHOLAS BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (25th ed. 1783) .......................................................................17

FREDERIC BARLOW, THE COMPLETE ENGLISH DICTIONARY (1772–73)........................17

THE FEDERALIST No. 39 ...................................................................................17

LOUIS FISHER, CONG. RESEARCH SERV., RS22132, LEGISLATIVE VETOES AFTER CHADHA (2002). .....................................................................26

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118 (2016)............................................................................28

PERRY'S ROYAL STANDARD ENGLISH DICTIONARY (1788) ........................................17

THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1789) .......................................................................17

LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 398 (2d ed. 1988)...............16

Kathryn Turner, *The Midnight Judges*, 109 U. PA. L. REV. 494 (1961).......................12

Ryan C. Williams, *The "Guarantee" Clause*, 132 HARV. L. REV. 602 (2018)...........................16

WISCONSIN LEGISLATIVE COUNCIL, MEMO: 2011 WISCONSIN ACT 7 (Feb. 15, 2011) ...........................................................................26

WISCONSIN LEGISLATIVE FISCAL BUREAU, SUMMARIES OF DECEMBER 2018
  EXTRAORDINARY SESSION BILLS AS PASSED BY THE LEGISLATURE (Dec. 6,
  2018) ....................................................................................................................................3

WISCONSIN LEGISLATIVE FISCAL BUREAU, INFORMATIONAL PAPER 76 (Jan. 2019) ....................25

## INTRODUCTION

Plaintiffs come to federal court seeking redress for their disappointment that certain politicians they supported in state election now have somewhat fewer powers than Plaintiffs had hoped those politicians would have. Article III of the U.S. Constitution, the political question doctrine, and numerous binding precedents all bar Plaintiffs from turning the federals courts into a forum for settling such local political disputes.

As a threshold matter, Plaintiffs plainly lack Article III standing to vindicate their concerns about the amount of power possessed by politicians that they support. The entirety of Plaintiffs' alleged harms flows from the fact that certain third-parties—two state politicians—now have less authority. Under Plaintiffs' capacious approach to Article III standing, any supporter of any politicians, at any level of government, could come to federal court any time that politician's office loses some power. For example, every supporter of Thomas Jefferson in the election of 1800 would have had standing to challenge the Judiciary Act of 1801, 2 Stat. 89, and John Adam's subsequent appointments; after all, these supporters surely hoped that Jefferson could make any such appointments. *See generally Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Or if Congress tomorrow repealed the President's statutory authority under the National Emergencies Act, Pub. L. 94–412, 90 Stat. 1255 (codified at 50 U.S.C. §§ 1601 *et seq.*), Plaintiffs' theory would give each person who voted for then-candidate Donald Trump standing to challenge this action in federal court; after all, when they voted for now-President Trump, they expected him to have this statutory authority. But, of course, Article III does not permit lawsuits based on such generalized, purely political grievances, and Plaintiffs' complaint must therefore be dismissed.

Plaintiffs' underlying merits argument—that the Wisconsin Legislature has taken away "too much" power from certain officers—is also a classic non-justiciable political question, providing independently sufficient grounds for dismissal. Plaintiffs lead claim is that the

Legislature violated the Federal Government's guarantee that each State will have a republican form of government.  The Seventh Circuit in *Risser v. Thompson*, 930 F.2d 549 (7th Cir. 1991), unambiguously held that Guarantee Clause claims is nonjusticiable, consistent with more than 150 years of U.S. Supreme Court precedent.  Plaintiffs attempt to brush off *Risser* in a conclusory footnote, while never explaining how their lawsuit can survive this binding holding.  As an adjunct to this legally foreclosed claim, Plaintiffs restate the same allegation and theory of constitutional wrong, but relabel these as arising under the First Amendment and the Equal Protection Clause.  Plaintiffs' rewording of their Guarantee Clause claim does nothing to solve their insuperable political question problems, and also runs directly into Seventh Circuit caselaw rejecting partisanship-based claims under the First Amendment and Equal Protection Clause.  And to the extent that Plaintiffs have articulated any cognizable claim—which, to be clear, they have not— each of the dozens of provisions that Plaintiffs challenge are measured and rational.  Notably, Plaintiffs do not cite *any* case, from *any* court, invalidating *any* enactment by *any* state's legislature on a theory resembling the one they bring to this Court.

Plaintiffs' failure to state a claim is reason enough to deny their Motion for a Preliminary Injunction, but Plaintiffs also make no showing sufficient for the extraordinary remedy of preliminary injunctive relief.  Plaintiffs do not even mention, let alone show, irreparable harm flowing from most of the provisions that they ask this Court to invalidate.  These provisions address diverse matters, from expanding the voting rights of overseas servicemembers to requiring notice-and-comment for guidance documents to adding to Wisconsin's large cache of joint legislative committee provisions.  And as to the few provisions that Plaintiffs discuss, they rely upon only boilerplate allegations of harm.  The public interest cannot possibly justify enjoining the dozens of provisions in Acts 369 and 370 on such a bare-bones showing.  This is especially so

2

because the chances that Plaintiffs will prevail in their fanciful lawsuit are vanishingly small, to put it generously, meaning that an injunction will cause needless confusion for Wisconsinites.

## BACKGROUND

A. In December 2018, the Wisconsin Legislature enacted, and the Wisconsin Governor signed, three bills into law: 2017 Wisconsin Act 368, 2017 Wisconsin Act 369 ("Act 369"), and 2017 Wisconsin Act 370 ("Act 370," and with Act 369, "Acts").  At all relevant times, both the Legislature and the Governor were serving terms that the people of Wisconsin elected them to under the Wisconsin Constitution.  Although Plaintiffs challenge every provision in Acts 369 and 370, these two acts contain dozens of provisions, most of which Plaintiffs do not mention in their Complaint or Motion for a Preliminary Injunction.  Acts 369 and 370 make the following changes to Wisconsin law, [1] with the ones that Plaintiffs cite in **bold**:[2]

*Provisions Relating to Litigation Impacting State Law*. Sections 3, 5, 7-8, 26-30, 97-98, and 101-103 of Act 369 largely focus on prohibiting the Attorney General from conceding away the constitutionality or other basis of validity of state law without the Legislature's input.  Under preexisting law, the Attorney General had the authority to "compromise and settle the action as . . . [he or she] determines to be in the best interest of the state," when representing the State or one of its entities as a defendant.  *See* WIS. STAT. § 165.25(6)(a)(1).  In addition, when the Attorney General initiated an action as a plaintiff, that officeholder could settle the lawsuit at the direction of an official, or the Governor, as relevant.  *Id.* § 165.08.  Meanwhile, the Wisconsin Court of Appeals has severely limited the Legislature's authority to intervene to defend state law, as a matter

---

[1] This summary is not intended to be comprehensive of every provision in Acts 369 and 370, and a more fulsome discussion is available from the non-partisan Legislative Fiscal Bureau at http://docs.legis.wisconsin.gov/misc/lfb/bill_summaries/2017_19/0002_december_2018_extraordinary_session_bills_as_passed_by_the_legislature_12_6_18.pdf.

[2] Plaintiffs also categorically mention other topics impacted by these laws, *see, e.g.*, PI Mot. 9, but it is often not clear which specific provisions they are referring to.

of statutory interpretation.  *See generally Helgeland v. Wis. Municipalities*, 2006 WI App. 216, 296 Wis. 2d 880, 724 N.W.2d 208.

Revising this regime to give the Legislature a seat at the table, **Section 30** of Act 369 now requires that before the Attorney General settles an action on behalf of the State or a state entity, as a defendant, the Legislature, as intervenor, must approve; or, if the Legislature has not intervened, the Joint Committee on Finance must approve.  *See* WIS. STAT. § 165.25(6)(a)(1). Under **Section 26** of Act 369, the Attorney General no longer has the authority to "compromise[] or discontinue[]" cases that he is prosecuting as a plaintiff, with the consent of the "officer, department, board or commission" or the Governor, as applicable, but must obtain approval from the Legislature, as intervenor; or, if the Legislature has not intervened, from the Joint Committee on Finance.  *Id.* § 165.08.  Under Sections **5**, 28, 29, 98, and 101 of Act 369, notice must be given to the Legislature if the constitutionality or other basis of validity of a state statute is challenged, *id.* §§ 806.04(11), 893.825, and the Legislature may intervene to defend the constitutionality of state law, *see id.* §§ 13.365(1)–(3), 165.25(1), 165.25(1m).  Section 3 of Act 369 permits the Legislature to obtain "legal counsel other than from the" Attorney General "if the acts or allegations underlying the action are arguably within the scope" of his or her duties, *id.* § 13.124. Section 97 of Act 369 establishes that the Legislature may intervene in legal challenges to the "construction or validity of a statute . . . at any time in the action as a matter of right."  *Id.* § 803.09(2m).  Finally, Sections 27 and 103(1) of Act 369 require the Attorney General to seek review before authorizing the expenditure of settlement funds and lapses all "unencumbered settlement funds" to ensure that settlement proceeds directly benefit Wisconsin citizens.  *See id.* § 165.10.

*Legislative Oversight Provisions*.  Sections 16, 39, and 64 of Act 369 and Sections 10-13 of Act 370 create or modify the authority of joint legislative committees, consistent with longstanding Wisconsin practice.  **Section 64** of Act 369 modifies the preexisting authority of the Joint Committee for Review of Administrative Rules to review administrative rules, now by permitting multiple suspensions of any such rule.  *See id.* § 227.26(2)(im).  Section 16 gives the Joint Committee on Legislative Organization authority to evaluate changes by the Department of Administration to security at the Capitol.  *Id.* § 16.84(2m).  Sections 18, **23** and 90 of Act 369 allow for legislative oversight of agency activities by requiring the Department of Administration to submit certain annual reports to the Joint Committee on Finance and the Legislature, *see id.* § 16.973(15); the Department of Veterans Affairs to notify the Joint Committee on Finance of the transfer of money to state veterans to certain funds, *id* § 45.57; and the Department of Corrections, upon request of the Legislature, to prepare a report regarding any persons pardoned or otherwise released prior to their original sentences' conclusion, *id.* § 301.03(16).  Sections 9 and 10 of Act 369 amend definitional provisions addressing the Joint Committee on Legislative Organization's authority to assign office space for the Legislature.  *Id.* § 13.90(3).  **Section 10** of Act 370 authorizes, among other things, either the Legislator or the Joint Committee on Finance to review[3] certain submission for waivers from the Federal Government by the Department of Health Services.  *Id.* § 20.940.  Section 11 of Act 370 gives the Joint Committee on Finance authority to review the reallocation of funds by the Department of Workforce Development, *see id.* § 49.175(2)(a), specifically designated in Sections 1-9, 18-26, 44(1), and 45 of Act 370, thereby

---

[3] The Department of Health Services must seek approval from the Joint Committee on Finance before it may "submit a request to a federal agency for a waiver or a renewal, modification, withdrawal, suspension, or termination of a waiver of federal law or rules or for authorization to implement a pilot program or demonstration project unless legislation has been enacted."  Wis. Stat. § 20.940(2).  This agency must comply with additional procedures before federal requests for renewals, *id.* § 20.940(4), or when submissions are required under legislation enacted after January 1, 2011, *id.* § 20.940(3).

replacing the previous statutory scheme which provided for a lump appropriation, *see id.* §§ 20.445, 106.05, 106.13, 106.18, 106.26, 106.272, 106.273, 106.275.  Section 12 enables the Joint Committee on Finance to review certain proposed reduction plans required to be submitted by the Department of Workforce Development.  *Id.* § 49.175(2).  The Department of Health Services, under Section 13 of Act 370, must submit proposals with an economic impact exceeding $7.5 million to the Joint Committee on Finance for review before seeking federal approval to amend Wisconsin's Medicaid program.  *See id.* § 49.45(2t).  Sections 84e-85r of Act 369 require recipients of economic development tax credits programs to submit reports attesting to the accuracy and truthfulness of the reports to the Wisconsin Economic Development Corporation ("WEDC"), *see id.* §§ 238.03, 238.04, 238.306, 238.308, 238.395, 238.396, and then requires the WEDC to verify the accuracy of a sample of these reports, *id.* § 238.16.  Section 87 and 88f of Act 369 both authorize the Joint Committee on Finance to review the proposed designation of "new enterprise zones" by the WEDC and create an annual process for receipt of such tax benefits, *id.* § 238.399.  **Sections 82m**, **83** and **102** of Act 369 adjust the WEDC's structure, including the tenure of each member.  *See id.* § 238.02(1)–(2); *see also* 2017 Wisconsin Act 369, §§ 102(2m), (2s), (2t), (2v) ("Nonstatutory provisions").

 *Codification of Certain Federally-Approved Plans and Other Regulations*.  **Section 14** and Sections 38-43 of Act 370 codify federal waivers for programs for childless adults already previously approved by the United States Department of Health and Human Services ("DHHS"), *see id* at § 49.45, and provide for the implementation of the State's reinsurance program for health carriers, recently enacted in 2017 Wisconsin Act 138, in accordance with the terms and conditions approved by DHHS on July 29, 2018.   *See* WIS. STAT. §§ 601.83, 601.85(4).  Sections 15-**17** of Act 370 codify existing regulations aimed at strengthening drug screening, testing, and treatment

regulations for able-bodied adults participating in certain public assistance programs, all approved by the Centers for Medicare and Medicaid Services on October 31, 2018. *See id.* §§ 49.79, 49.791. Finally, Sections 27-37 of Act 370 codify the regulations adopted by the Department of Public Works concerning job search requirements to receive unemployment insurance. *See id.* § 108.04.

*Prohibition on Certain Re-Nominations*. **Section 4** of Act 369 specifies that if the Senate rejects the Governor's nomination, that person may not be nominated again for the same office or perform any duties of the office or position during the legislative session. *Id.* § 13.127.

*Changes to Wisconsin Voting Law*. Sections 1, 1B, 1C, 1D, 1E, 1F, 1FG, 1FM, 1G, 1GC, 1GD, 1GF, 1H, 1I, 1J, 1JB, 1JS, 1K, 1L, 1M, 1MG, 1MP, 1MQ, 1MS, 1MT, 1MV, 1N, 1NG, and 91-95 of Act 369 focus upon Wisconsin voting laws. The vast majority[4] of these voting-related provisions make the law more favorable to military and other oversees electors, such as 1MS (expanding the ability to witness a vote). Beyond these military-voter related provisions, Section 1K provides that absentee voting may occur "no earlier than 14 days preceding the election and no later than the Sunday preceding the election." *Id.* § 6.86(1)(b). Section 1 clarifies that certain unexpired technical college student IDs qualify as a proper form of identification, consistent with the same requirements for "university or college" IDs. *Id.* § 5.02(6m). Sections 91-95 codify preexisting administrative regulations, which detail the process for obtaining a Wisconsin identification card by eligible voters and set forth specific requirements with which this same agency must comply. *See id.* §§ 343.165(8), 343.50. **Section 91** mandates that the Department of Transportation provide an identification card if it concludes that it is "more likely than not" that an applicant's petition is

---

[4] *See* WIS. STAT. §§ 5.02(12n), 5.05(13)(c)–(d), 6.22(2)(b),(e), 6.22(4)(a), (c), 6.24(2),(4), 6.25(1)(b), 6.276(1), 6.34(1), 6.855(5), 6.865(1), 6.87(2)-(4), 6.88(1), 6.97(1), 7.15(1) (Sections 1B through 1JS and 1L through 1NG).

correct, *id.* § 343.165(8)(h), while Section 92 allows an applicant's receipt to be used for 60 days as a "temporary identification card," *id.* § 343.50(1)(c).[5]

*Regulation of Guidance Documents*.  Sections 22, 31, 38, 65-71, and 96 of Act 369 regulate the issuance of guidance documents.  Section 31 defines "guidance document," in the same manner as Section 32 denotes a "rule."  *Compare id.* § 227.01(3m), *with* § 227.01(13).   Section 38 establishes the statutory process for new guidance documents, including posting of the proposed guidance document, a 21-day notice-and-comment period, and certification that the proposed guidance document complies with Wisconsin law.  *See id.* § 227.112(1)-(6).  Agencies also must put all preexisting guidance documents through this process before July 1, 2019.  *Id.* § 227.112(7).[6] Finally, Sections 65-71 permit court challenges to guidance documents and establish the requisite procedure for litigants.  *Id.* § 227.40.

*Codification of the Elimination of Agency Deference*. Sections 35 and 80 of Act 369 codify the Wisconsin Supreme Court's holding in *Tetra Tech EC, Inc. v. Wisconsin Department of Revenue*, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21, ending Wisconsin's practice of deference to agency interpretations of law.  *See* WIS. STAT. §§ 227.10(2g), 227.57.

B. On February 21, 2019, more than two months after the Governor signed Acts 369 and 370, the Democratic Party of Wisconsin and several individual plaintiffs who identify with that Party (collectively, Plaintiffs) brought this lawsuit, asking this Court to invalidate all of the provisions in Act 369 and 370.  Plaintiffs allege that all of the provisions are unconstitutional under the Guarantee Clause because they take away authority from certain officials in Wisconsin

---

[5] This Court enjoined Sections 1, 1K, and 92 for falling within the scope of its prior July 29, 2016, injunction.  *See* Order Granting Motion to Enforce Injunction at *2, 4–5, *One Wisconsin Inst. Inc., et al. v. Thomsen, et al.*, Case No. 15-cv-324-jdp (W.D. Wis. Jan. 17, 2019), ECF No. 338.

[6] This provision exempts guidance documents issued by the Board of Regents of the University of Wisconsin System, the Technical College System Board, and the Department of Employee Trust Funds.  *See id.* § 227.112(7)(b).

8

government "in order to blunt . . . electoral results."  Compl. ¶¶ 8, 87–88.  Plaintiffs allege that "for much the same reasons" all of the provisions violate the First Amendment and the Equal Protection Clause.  *Id.* ¶¶ 8, 91–94, 98–101.  On the same date, Plaintiffs filed their Motion for a Preliminary Injunction and Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction (collectively, "Motion for a Preliminary Injunction"), repeating the same theories of constitutional violation, and requesting that this Court enjoin both Acts as unconstitutional.  In their Motion for a Preliminary Injunction, Plaintiffs do not even cite, let alone discuss, most of the provisions that they ask this Court to enjoin.

## ARGUMENT

### I.   This Court Should Dismiss Plaintiffs' Complaint

As relevant here, this Court can dismiss a complaint for lack of subject matter jurisdiction, for alleging a political question, and for failure to state a claim as a matter of law.  *See generally* FED. R. CIV. P. 12(b)(1), (6).  While this Court must accept all well-pleaded facts as true, *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639–40 (7th Cir. 2015), it is not "bound to accept as true a legal conclusion couched as a factual allegation," nor accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3, 570 (2007).

This Court should dismiss Plaintiffs' Complaint for three independently sufficient reasons.  First, Plaintiffs do not have Article III standing to challenge any of the provisions in Acts 369 and 370.  Second, Plaintiffs allege only non-justiciable political questions that are not subject to any judicially administrable standard and/or do not articulate any recognized constitutional theory.  Dismissal on this ground is appropriate for lack of federal subject matter jurisdiction, for raising a political question, and failure to state a claim, *see Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004)

(plurality op.); *id.* at 306 (Kennedy, J., concurring in the judgment). Third, all of Plaintiffs' claims fail as a matter of law for multiple reasons.

### A. Plaintiffs Lack Article III Standing To Complain About The Loss Of Power Suffered By Third-Party State Officials

1. "The Supreme Court has characterized the doctrine of standing as 'an essential and unchanging part of the case-or-controversy requirement of Article III' of the Constitution." *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish the "irreducible constitutional minimum" of Article III standing, a plaintiff must demonstrate: (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citation omitted). These elements are "'an indispensable part of the plaintiff's case, [so] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Id.* at 561. Thus, at the pleading stage, "the plaintiff must allege facts that, assuming their truth, would establish the injury-in-fact elements necessary to support standing." *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 752 (7th Cir. 2007). To satisfy this "foremost" "requirement[]," a plaintiff must plead sufficient facts to show that the plaintiff has suffered "invasion of a legally protected interest" that is "concrete and particularized," i.e., which "affect[s] the plaintiff in a personal and individual way." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560). And because "standing is not dispensed in gross," a plaintiff must make allege all three elements of standing—including injury-in-fact—for every provision that the plaintiff challenges. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *accord Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

10

While the fact that the "plaintiff is not himself the object of the government action" that the plaintiff seeks to challenge does not alone "preclude[]" standing, this irreducible minimum is "ordinarily substantially more difficult to establish" in such circumstances. *Lujan*, 504 U.S. at 562 (citation omitted).  Being offended by the state's actions toward a third party, such as a politician, is categorically insufficient; "[o]therwise there would be universal standing: anyone could contest any public policy or action he disliked." *Books v. Elkhart Cty., Ind.*, 401 F.3d 857, 870 (7th Cir. 2005).  When it comes to representational rights, in particular, a citizen's right is "embodied in his right to vote" for the particular official, while the citizen's general interest in "policies adopted by the legislature on the facts here is a nonjusticiable general interest common to all members of the public." *Gill*, 138 S. Ct. at 1921 (citation omitted).

2.   In their Complaint, Plaintiffs allege harms flowing from the following chain of allegations: Plaintiffs engaged in electioneering activities in support of two politicians for Governor and Attorney General of Wisconsin, and because of Acts 369 and 370, those politicians will now have less authority than Plaintiffs had hoped they would have, meaning these politicians will be less able to achieve Plaintiffs' policy goals and Plaintiffs will have more difficulty conducting electioneering activities in the future.  *See* Compl. ¶¶ 78–85.

Plaintiffs have not cited any case, from any federal court, accepting such a conjectural, speculative, generalized theory of Article III standing.  As the Supreme Court has explained, while the fact that the law only regulates third parties—here, third-party politicians—does not automatically "preclude" a finding of standing, standing is "ordinarily *substantially* more difficult to establish" in such circumstances.  *Lujan*, 504 U.S. at 562 (emphasis added, citation omitted). Plaintiffs ignore the Supreme Court's instructions that they must make a "substantially more difficult" showing, instead relying entirely upon the type of high-level assertions that *any* supporter

of any candidate could raise, in a situation where that candidate ends up with less authority than supporters would like and who are disappointed as a result.  *Id.*  As the Supreme Court explained in *Gill*, allegation that a certain action will lead to the adoption of policies that plaintiffs do not like, or the non-adoption of policies that plaintiffs favor, is insufficient as a matter of law because these are "nonjusticiable general interest[s] common to all members of the public."  138 S. Ct. at 1931 (citation omitted).  "Otherwise there would be universal standing: anyone could contest any public policy or action he disliked."  *Books*, 401 F.3d at 870.  It is, of course, true that every time a policy position that a party favors fails to become law, that party and its fervent supporters can claim that they have suffered some unspecified loss in terms of the former's ability to "fundraise, register voters, attract volunteers, generate support from independents, and recruit candidates." Compl. ¶ 84.  But Legislative Defendants are aware of no case that has even suggested, let alone held, these natural follow-on impacts of policy frustration meet the substantial burden for alleging Article III standing where the laws govern the actions of third-party politicians.

A couple of examples highlight why Plaintiffs' standing theory must be wrong, although many more such examples are easy to conjure up.  Plaintiffs' approach would have given Article III standing to anyone who supported Thomas Jefferson in the election of 1800 to challenge the Judiciary Act of 1801 and John Adam's pre-inauguration appointments.  *See generally Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); Kathryn Turner, *The Midnight Judges*, 109 U. PA. L. REV. 494 (1961).  Jefferson's supporters doubtlessly hoped that when he took office, he could make such appointments.  And, closer to the present day, if Congress responded to the President's recent actions by repealing the National Emergencies Act, thus taking away his power to declare national emergencies under that Act, Plaintiffs' theory would give Article III standing to the President's supporters, who voted for him with the expectations that he would have this statutory authority

throughout his term.  Surely, these supporters could credibly allege, following Plaintiffs' lead, that their voters are now depressed and harder to turn out because President Trump was not able to achieve his central campaign promise of building a wall across the nation's southern border. Indeed, under Plaintiffs' theory, any infringement of the statutory power of any elected official, at any level of government (federal, state, or local), would give Article III standing to that politician's supporters, which is obviously not the law.

Finally, and at the very minimum, Plaintiffs have not alleged injuries flowing from the vast majority of the provisions in Act 369 and Act 370.  Their Complaint only mentions alleged harms flowing from Sections 82m, 102, 91, 26, 4, 30, and 64 of Act 369[7] and Sections 14, 13, 17, 44, and 10 of Act 370.[8]  While Plaintiffs allege some harm from these provisions as part of their preliminary injunction briefing, they do not argue that those alleged harms are sufficient to establish Article III standing.   But even if one were to take Plaintiffs' preliminary injunction into account, that would only involve the twelve aforementioned provisions.  To take just a couple of examples, Plaintiffs do not purport to explain how they are harmed by numerous provisions expanding the voting rights for military members and oversees service members, *see supra*, the provisions subjecting guidance documents to notice-and-comment and judicial review, WIS. STAT. § 227.01(1)-(5), the codification of the elimination of agency deference, *id.* §§ 227.10, 227.15, or permitting the Legislature to hire its own attorney in some cases, *id.* § 13.124.  Because "standing is not dispensed in gross," Plaintiffs' failure to allege Article III injury flowing from the vast

---

[7] Plaintiff's allegations as to Act 369 are limited to Compl. ¶¶ 59 & nn. 20–21, 60 & n.22, 61 & n.23, 62, 66 & nn. 28, 31–32.

[8] Alleged harms by Act 370 are detailed in Compl. ¶¶ 63 & n. 25, 64 & n.26, 65 & n.27, 66 & nn. 29–30.

majority of the provisions that they challenge requires dismissal.  *See Lewis*, 518 U.S. at 358 n.6; *accord Town of Chester*, 137 S. Ct. at 1650.

**B. Plaintiffs' Lawsuit Is Entirely Foreclosed By Several Binding Lines Of Precedent, Especially The Political Questions Caselaw**

A case presents a nonjusticiable political question—requiring dismissal of the Complaint—where, as relevant here, there are "a lack of judicially discoverable and manageable standards for resolving" the dispute that the plaintiff seeks to bring before the federal courts.  *Nixon v. United States*, 506 U.S. 224, 228 (1993) (citation omitted); *accord Miami Nation of Indians of Indiana, Inc. v. U.S. Dep't of the Interior*, 255 F.3d 342, 346–47 (7th Cir. 2001).  This limitation on the courts' authority reflects the important separation of powers principle that "courts are fundamentally underequipped to formulate . . . [certain] policies or develop standards for matters not legal in nature."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

Plaintiffs have filed three claims, all built around the same central allegation: the Wisconsin Legislature took away too much power from state offices because, in Plaintiffs' telling, the Legislature was concerned about the party affiliation of the future occupants of those offices.  *See* Compl. ¶¶ 8, 87–89; *accord* PI Mot. 1, 16–18.  In their first cause of action, Plaintiffs correctly situate this theory within the U.S. Constitution's framework under the Guarantee Clause.  While Plaintiffs' initial candor is laudable, it also ends their lawsuit because the Seventh Circuit has already held that alleged violations of the Guarantee Clause present nonjusticiable political questions.  Then, in an effort at misdirection, Plaintiffs allege violations of the First Amendment and Equal Protection Clause "for much the same reasons" articulated in their Guarantee Clause discussion.  Compl. ¶¶ 8, 91–94, 98–101; *see* PI Mot. 18–27.  This clumsy repackaging does not salvage Plaintiffs' Complaint for three independently sufficient reasons, as explained below.

14

1. *Guarantee Clause*.  The Seventh Circuit has unambiguously held that the Guarantee Clause—which promises that the "United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion," U.S. CONST. art. IV, § 4—is nonjusticiable for lack of judicially manageable standards.  In *Risser v. Thompson*, 930 F.2d 549 (7th Cir. 1991), two Wisconsin legislators brought a suit in this Court, alleging that the powerful veto authority that the Wisconsin Governor possesses violated the Guarantee Clause. On appeal, the Seventh Circuit held that the lawsuit had "no possible merit," affirming the district court's dismissal.  *Id.* at 551.  The Seventh Circuit explained that under binding precedent, the Constitution "does not require a state to allocate powers among the branches of state government in the same manner in which the Constitution prescribes that allocation among the branches of the federal government."  *Id.* at 552 (collecting numerous cases); *accord Mayor of City of Phila. v. Educ. Equality League*, 415 U.S. 605, 615 n.13 (1974) ("The Constitution does not impose on the States any particular plan for the distribution of governmental powers").  Then, discussing the Guarantee Clause, *Risser* concluded that the Supreme Court has already "held" that this Clause is "not to be justiciable," and that this position is "too well entrenched to be overturned at our level of the judiciary," while citing the Founders' disagreement as to the meaning of "republican" government.  930 F.2d at 552.  Plaintiffs have no answer for *Risser*, attempting to brush it off in a footnote, *see* PI Mot. 12 n.11, but that case forecloses their Guarantee Clause claim.

*Risser* derived its holding from 150 years of Supreme Court precedent rejecting Guarantee Clause claims as nonjusticiable.  The Supreme Court first reached this conclusion in *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), and has repeatedly reaffirmed this holding over the next 150 years.  "As to the guaranty to every state of a republican form of government, it is well settled that the questions arising under it are political, not judicial, in character and thus are for the

consideration of the Congress and not the courts." *Ohio ex rel. Bryant v. Akron Metro. Park Dist.*, 281 U.S. 74, 79–80 (1930); *accord Colegrove v. Green*, 328 U.S. 549, 556 (1946); *Mountain Timber Co. v. Washington*, 243 U.S. 219, 234–35 (1917); *O'Neill v. Leamer*, 239 U.S. 244, 247–48 (1915); *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 147 (1912); *Forsyth v. City of Hammond*, 166 U.S. 506, 519 (1897); *Minor v. Happersett*, 88 U.S. 162, 176 (1875). While *New York v. United States*, 505 U.S. 144 (1992), suggested that "perhaps" the Court had not closed the door on "all claims under the Guarantee Clause," *id.* at 185, the Seventh Circuit has explained that *New York*'s caveat *only* referred to claims "raised by states" as against federal encroachment, while describing as a Supreme Court "holding" that "claims under the Guarantee Clause are not justiciable when raised by private persons," *Travis v. Reno*, 63 F.3d 1000, 1007 (7th Cir. 1998).[9]

Guarantee Clause claims are nonjusticiable under binding caselaw precisely because the meaning of a "republican form of government" is too uncertain to give rise to judicially manageable standards. *See Baker v. Carr*, 369 U.S. 186, 223 (1962) ("[T]he Guarantee Clause is not a repository of judicially manageable standards which a court [can] utilize independently in order to identify a State's lawful government."). As *Risser* recognized, the Founders disagreed as to the meaning of "republic." 930 F.2d at 553. John Adams professed that he "'never understood'" what its promise of a "republican government" meant, and added: 'I believe no man ever did or

---

[9] While a holding that the Guarantee Clause is justiciable when invoked by States would be consistent with some scholars' suggestion that such claims should be available to States because "[i]t is, after all, the states to which the clause extends its explicit *guarantee*," LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 398 (2d ed. 1988) (emphasis added), this would not save Plaintiffs' case. But, in any event, a renewed focus on the word "guarantee" in the Clause actually provides an additional reason to hold all Guarantee Claims are nonjusticiable. As Professor Ryan C. Williams has recently powerfully argued, after a comprehensive historical analysis, "[b]y its terms, the Guarantee Clause imposes a duty on the 'United States' for the benefit of the 'States.' [But] under well-settled principles of international law applicable to similarly worded 'guarantee' provisions, such obligations conferred no new rights or entitlements." *The "Guarantee" Clause*, 132 HARV. L. REV. 602, 687–88 (2018). If the Seventh Circuit or the Supreme Court ever overturn the principle that all Guarantee Clause claims are nonjusticiable due to a lack of judicially manageable standards, Professor Williams' seminal article would provide an independent basis for dismissing all Guarantee Clause claims. Legislative Defendants reserve the right to make arguments based upon Professor Williams' article, including if this case progresses to appellate courts with the authority to overrule *Risser*.

ever will.'" *Id.* (citation omitted).   James Madison defined "republic" as "a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their office during pleasure, for a limited period, or during good behavior." *Id.*; *see also, e.g.*, THE FEDERALIST No. 39 (defining a "republic" as "a government which derives all its powers directly or indirectly from the great body of the people").   Founding-era dictionaries similarly defined "republic" or "republick," at a high level of generality, as merely a "state in which the power is lodged in more than one," FRANCIS ALLEN, A COMPLETE ENGLISH DICTIONARY (1765); as "placing the government in the people," THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1789); PERRY'S ROYAL STANDARD ENGLISH DICTIONARY (1788); 2 SAMUEL J. JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (8th ed. 1786); FREDERIC BARLOW, THE COMPLETE ENGLISH DICTIONARY (1772–73); as a "commonwealth, a free state," JOHN ASH, A NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1775); NICHOLAS BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (25th ed. 1783); or as "a popular state or government; or a nation where the body, or only a part of the people, have the government in their own hands," 4 EPHRAIM CHAMBERS, CYCLOPEDIA OR AN UNIVERSAL DICTIONARY OF ARTS AND SCIENCES (1783).[10]

---

[10] Of course, one can come up with extreme hypotheticals—such as totalitarian dictatorship at the State level—that would violate any Founding-era (or even present-day) definition of a "republican form of government."   The possibility of such hypotheticals led a couple of courts to deny curtly Guarantee Clause claims on the merits, rather than following *Risser*'s lead and holding them categorically nonjusticiable.   One leading case taking this approach is *Largess v. Supreme Judicial Court*, 373 F.3d 219 (1st Cir. 2004), where the court was troubled by hypotheticals such as "permanent martial law, [the] declaration of a monarchy, [or] perhaps a hostile takeover of one branch by another." *Id.* at 223.   But *Luther* does not support Plaintiffs' position.   First, this Court is bound by *Risser*'s holding that Guarantee Clause claims are nonjusticiable and it is up to that Court (and the Supreme Court) to determine whether the possibility of extreme examples like those that *Largess* discusses merits abandoning *Risser*'s categorical rule. Second, even if *Largess* and not *Risser* were the law in the Seventh Circuit, that would not help Plaintiffs.   *Largess* easily rejected the Guarantee Clause claim in that case on the merits, while explaining that "the Guarantee clause does not require a particular allocation of power within each state so long as a republican form of government is preserved." *Id.* at 227.   Nothing here resembles permanent martial law or other such extremes.   *See supra* pp. 3–9.

While Plaintiffs highlight some of their preferred Founding-era sources, they do not suggest what judicially manageable standards they would derive from those sources, falling back upon vague claims of the importance of "representative democrac[y]" and the need that the branches of any state government "resemble those of the federal government" to some unspecified extent. *See* PI Mot. 12–16; *see* Compl. ¶¶ 8, 87–88. Those are just the types of general assertions that the Seventh Circuit rejected in *Risser* as the basis for a Guarantee Clause jurisprudence. *See* 930 F.2d at 552–54. Indeed, while Plaintiffs project confidence that the actions here violated their bespoke understanding of the basics of republican government, *see* PI Mot. 16–18, they do not explain what judicially administrable standards they rely upon. And Plaintiffs do not cite a single case that invalidated any provisions enacted by any state legislature in this Nation's history on anything like their theory of republican government.

Finally, the state-court litigation over the Acts here well-demonstrates the wisdom of leaving the issue of how a state divides powers among its elected officials entirely to state law, without federal involvement under the Guarantee Clause. Wisconsin has adopted a particularly fluid understanding of separation of powers. *See Martinez v. DILHR*, 165 Wis. 2d 687, 696, 478 N.W.2d 582 (1992) ("Wisconsin courts interpret the Wisconsin Constitution as requiring shared and merged powers of the branches of government rather than an absolute, rigid and segregated political design."). This flexible regime includes an Attorney General whose powers are subject to the Legislature's plenary control, *see State v. City of Oak Creek*, 232 Wis. 2d 612, 605 N.W.2d 526 (2000), and a broad tolerance for legislative committee veto provisions, *see Martinez,* 165 Wis. 2d at 701, which would likely not survive review, as applied to Congress, as a matter of federal law under *I.N.S. v. Chadha*, 462 U.S. 919 (1983). Whether and how the Acts fit within Wisconsin's flexible separation of powers doctrine is currently the subject of vigorous litigation

in *Service Employees International Union, et al. v. Vos, et al.*, No. 2019cv302 (Wis. Cir. Ct. 2019). As *Risser* explained, the federal courts have nothing to say about this state-level separation of powers dispute because "the federal Constitution does not fix the balance of power between branches of state government." 930 F.2d at 554.

2. *First Amendment and Equal Protection Clause*. As an adjunct to their legally foreclosed Guarantee Clause claim, Plaintiffs style the same alleged grievances under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, while stating that the Acts violate these provisions "for much the same reasons" as they violate the Guarantee Clause. Compl. ¶ 8. Plaintiffs' repackaging of their Guarantee Clause claim fails to save their Complaint from dismissal, for at least three independently sufficient reasons.

*First*, the political question doctrine forecloses Plaintiffs' novel First Amendment and Equal Protection Clause claims for "much the same reasons," Compl. ¶ 8, that the political question doctrine dooms their Guarantee Clause claim. As with Plaintiffs' Guarantee Clause claim, one of the central questions under Plaintiffs' First and Fourteenth Amendment theories is whether a state legislature took "too many" powers from officials in a State. *See supra* pp. 15–18. Plaintiffs do not purport to explain how many powers a legislature may take away from politicians without violating the claimed rights of their political supporters, or how courts are even supposed to begin crafting a judicially manageable doctrine on this score. *See supra* pp. 18–19.

Nor does Plaintiffs' allegation that the Wisconsin Legislature acted with partisan intent, Compl. ¶¶ 7–8, 91–94, 98–101; PI Mot. 18–27, render their novel First Amendment and Equal Protection Clause theories judicially manageable, even if this Court were to put aside the Seventh Circuit's caselaw foreclosing any such claims as a matter of First Amendment and Equal Protection Clause doctrine, as discussed below. The Supreme Court's decisions in *Vieth v. Jubelirer*, 541 U.S.

19

267 (2004), and *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*"), settle this issue.  In *Vieth*, the plaintiffs proposed a test for unlawful partisan gerrymandering that required, among other showings, a demonstration that the legislature acted with the intent to seek partisan advantage.  *See* 541 U.S. at 286–87 (plurality op.).  The Supreme Court nevertheless held that their Equal Protection Clause claim failed—*at the motion to dismiss stage*—because, in the words of Justice Kennedy's controlling plurality opinion, Plaintiffs had failed to articulate a "limited and precise" legal standard for determining how much partisan *effect* is too much.  *Id.* at 306 (Kennedy, J., concurring in the judgment).  Then, just two years later, in *LULAC*, plaintiffs alleged that the legislature had a "sole-intent" to seek partisan advantage in redrawing their legislative maps, and that this violated the First Amendment and the Equal Protection Clause.  548 U.S. at 418 (opinion of Kennedy, J.).  The Supreme Court again held that this claim failed as a matter of law, with Justice Kennedy explaining that even *sole* partisan intent does not save a cause of action because, in order to overcome the political question doctrine, plaintiffs must "show a burden, *as measured by a reliable standard*, on the complainants' representational rights."  *Id.* (emphasis added).

Plaintiffs are in the same position as the plaintiffs in *Vieth* and *LULAC*: alleging partisan intent, and then failing to propose a limited, precise, reliable standard for courts to adjudicate how much partisan effect is too much.  Plaintiffs' claims must thus be dismissed.  *See Vieth*, U.S. at 278 (plurality op.); *id.* at 306 (Kennedy, J., concurring in the judgment).

*Second*, Plaintiffs are building their new causes of action around an allegation of partisan intent by the Legislature, Compl. ¶¶ 7–8, 91–94, 98–101, but the Seventh Circuit's caselaw forecloses such a cause of action.  In *Hearne v. Board of Education of City of Chicago*, 185 F.3d 770 (7th Cir. 1999), the Seventh Circuit faced a claim that the Illinois legislature violated the Equal

Protection Clause by enacting a facially neutral law with the partisan intent of retaliating against a teacher's union.  The Seventh Circuit easily dispatched the union's partisanship-based claims—in two terse paragraphs—explaining that "there is no rule whereby legislation that otherwise passes the proper level of scrutiny (and does not infringe on a fundamental right, or rest on an impermissible distinction such as race), becomes constitutionally defective because one of the reasons the legislators voted for it was to punish those who opposed them during an election campaign."  *Id.* at 775 (citations omitted).  The Seventh Circuit has followed the same approach in multiple First Amendment and Equal Protection Clause cases since *Hearne*, including in two recent cases alleging partisan motives by the Wisconsin Legislature.  *See Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 654 (7th Cir. 2013) ("[W]e must resist the temptation to search for the legislature's motivation for the Act's classifications."); *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) ("[I]f a nondiscriminatory law is supported by [any] valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators."); *accord Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 684 F.3d 462, 467–70 (4th Cir. 2012); *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013); *In re Hubbard*, 803 F.3d 1298, 1312–13 (11th Cir. 2015).

Plaintiffs do not even mention *Hearne*, *Wisconsin Education Association Council*, or *Frank*, let alone attempt to explain how their First Amendment and Equal Protection Clause claims survive these decisions' core reasoning.

*Finally*, even putting justiciability and binding Seventh Circuit caselaw aside, the First Amendment and Equal Protection Clause theories that Plaintiffs attempt to invoke simply do not exist.  Under Plaintiffs' submission, a state legislature's decision to lessen the authority that certain state officials can wield violates the free speech and equal protection rights *of those officials'*

21

*political supporters*, at least where the legislature acts with partisan intent.  But none of the many cases that Plaintiffs cite, *see* PI Mot. 18–26, support the notion that this implicates First Amendment or Equal Protection Clause rights.  Rather, all of these cases involve deprivations of the plaintiffs' own rights, like publishing in newspapers*, see New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964), distributing films with a political message during elections periods, *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329 (2010); having the opportunity to vote for a particular candidate or in a particular primary election, *see Anderson v. Celebrezze*, 460 U.S. 780, 805–06 (1983); *see California Democratic Party v. Jones*, 530 U.S. 567, 586 (2000); appearing on a ballot, *see Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518 (7th Cir. 2017); having one's ballot counted using the same standards as other citizen's ballots, *see Bush v. Gore*, 531 U.S. 98 (2000); having one's vote count as much as citizen's votes, *see Reynolds v. Sims*, 377 U.S. 533 (1964); not being fired from a job for political reasons, *see Branti v. Finkel*, 445 U.S. 507 (1980); not losing housing or public assistance opportunities for discriminatory reasons, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 538 (1973); and not paying a tax to vote, *see Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966).

Plaintiffs do not allege any deprivations of any of these First Amendment or Equal Protection Clause rights, or any other recognized rights of which Legislative Defendants are aware. Plaintiffs do not argue that they were silenced by the Acts, could not vote for their preferred candidate, lost a job because of their political views, missed out on housing or food stamps opportunities because of discriminatory legislation, and so on.  Indeed, Plaintiffs do not allege that they have any less legal rights, in any respect, today than they did before the enactment of Acts 369 and 370.  More generally, Plaintiffs do not cite any decision, from any court, even

22

recognizing—let alone granting relief under—a theory whereby the supporters of a political candidate lose their free speech or equal protection rights because of laws limiting the authority of officials whom they supported.

### C.  Plaintiffs' Lawsuit Also Fails As A Matter Of Law On The Merits

If this Court concludes that Plaintiffs have standing and have stated any justiciable claim, such claims would easily fail on the merits as a matter of law.  When courts have addressed Guarantee Clause claims on the merits, usually as a belt-and-suspenders back-stop to a nonjusticiability holding, they have dismissed the claims after summarily explaining that the provisions at issue do not create a state-level "dictator," or other such extremes.  *See, e.g.*, *Risser*, 930 F.2d at 553.  Similarly permissive is the inquiry for facially neutral laws, which do not discriminate on a protected basis or violate established First Amendment rights, like the right against content-based restrictions on speech.  Such laws are subject only to rational basis review, under which "a law avoids constitutional scrutiny as long as it bears a rational relationship to a legitimate government interest."  *Wis. Educ. Ass'n*, 705 F.3d at 653.  Under this kind of review, courts "do not [even] require the state to 'actually articulate' the law's purpose or 'produce evidence to sustain the rationality' of the classification."  *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).  Instead, plaintiffs "must 'negative every . . . basis which might support' the law," and there is no requirement that the law's rational be "in the record[,] so long as it finds 'some footing in the realities of the subject addressed by the legislation.'"  *Id.* (quoting *Heller*, 509 U.S. at 320–21).  Claims of the legislature's alleged intent, including assertions of "animus," are irrelevant unless "no rational basis exists" for the law.  *Id.* at 654.

In the present case, Plaintiffs challenge all of the dozens of provisions in Acts 369 and 370, while failing to mention many of those diverse provisions, let alone attempting to make the type

23

of showing required for a finding of a constitutional violation under the relevant constitutional doctrines discussed above. Instead, Plaintiffs rely upon hyperbolic assertions that the Legislature stripped the Governor and Attorney General of their powers "[t]o the greatest extent possible." PI Mot. 16. In truth, the Wisconsin Governor remains one of the most potent executives in the United States, empowered to wield such a powerful, bespoke veto authority that two legislators in *Risser* argued that this authority itself violated the Guarantee Clause. And while the Attorney General in Wisconsin is subject to the Legislature's plenary control, *see Oak Creek*, 232 Wis. 2d at 628, the Legislature hardly stripped him of his powers "[t]o the greatest extent possible," PI Mot. 16. Rather, it merely made some adjustments, giving itself a limited seat at the table in a select category of cases, while leaving the Attorney General with the overwhelming majority of his vast constitutional powers. *See generally* WIS. STAT. §§ 165 *et seq*.

Below, Legislative Defendants address briefly the numerous provisions in Acts 369 and 370 by category, explaining why each category of law does not even arguably deprive Wisconsinites of republican government or impose irrational restrictions on anyone (and certainly not on Plaintiffs, who are not even subject to these laws):

*Provisions Relating to Litigation Impacting State Law*. These provisions, only three of which Plaintiffs specifically cite, Compl. ¶¶ 61, 66 (citing Sections 26 and 30 of Act 369); PI Mot. 17 n.25 (Section 5 of Act 369), create a modest power-sharing arrangement between the Attorney General and the Legislature, in a limited category of cases, while also giving the Legislature certain intervention rights. Under preexisting Wisconsin law, the Attorney General had unilateral authority to settle away the constitutionality or other basis of validity of state law. The Legislature was troubled by the possibility of the Attorney General exercising this authority to settle away laws that he did not like. The Legislature was similarly concerned about the Attorney General

24

agreeing with plaintiffs to adopt such a narrow understanding of state law as to render it irrelevant or defeat its core purpose, or withdrawing from litigation challenging federal laws that preempt state law.   The Supreme Court has articulated why this concern is legitimate and consistent with the separation of powers: "[W]hen [a legislature] has passed a statute and a [Governor] has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify [the legislature's] enactment solely on its own initiative."   *United States v. Windsor*, 570 U.S. 744, 762 (2013).[11]   The Legislature's new provisions on this score merely enact a modest, power-sharing regime, under which the Legislature can have input if the Attorney General wishes to settle away state law, even as the Attorney General must be the officer who initiates any such possible settlement.   Other than these modest changes, the Attorney General's broad powers under Chapter 165 remain just as they were before December 2018.

*Legislative Oversight Provisions*.   These provisions, only a couple of which Plaintiffs cite, Compl. ¶¶ 59, 66 (citing Sections 64, 82m, and 102 of Act 369 and Section 10 of Act 370); PI Mot. 21 (citing Sections 82m, 83, and 102 of Act 369), give the Legislature—usually speaking through joint committees—the authority to review certain executive action, while making certain other adjustments to administrative committee structures and procedure.   These provisions are entirely in line with the many dozens of similar provisions that the Wisconsin Legislature has enacted over the last four decades.   *See generally* WISCONSIN LEGISLATIVE FISCAL BUREAU, INFORMATIONAL PAPER 76 (Jan. 2019), *available at* http://docs.legis.wisconsin.gov/misc/lfb/informational_papers/january_2019/0076_joint_committ

---

[11] The Attorney General's recent decision to attack, rather than defend, many of the provisions in Acts 369 and 370 in currently ongoing state litigation, *SEIU*, No. 2019cv302, Dkt. Nos. 69, 74 and 75, or to refuse to intervene to defend even more laws in another state case, *see League of Women Voters of Wisconsin, et al. v. Knudson, et al.*, No. 2019CV000084 (Wis. Cir. Ct. 2019), illustrates the separation of powers problem that the Legislature was seeking to address.

ee_on_finance_informational_paper_76.pdf.   As the Wisconsin Supreme Court explained in upholding just such provisions in its landmark decision in *Martinez*, it is "incumbent on the legislature, pursuant to its constitutional grant of legislative power, to maintain some legislative accountability over rule-making," and this rationale applies for the same reason, and to the same extent, for other actions by administrative agencies.   165 Wis. 2d at 701.   Notably, notwithstanding the U.S. Supreme Court's decision in *Chadha*, Congress has adopted over 400 just such legislative committee review provisions over the last couple of decades, yet no one has suggested that this has made Congress a "dictator."   *Risser*, 930 F.2d at 553; *see also* LOUIS FISHER, CONG. RESEARCH SERV., RS22132, LEGISLATIVE VETOES AFTER *CHADHA* at 5 (2002), *available at* http://www.loufisher.org/docs/lv/4116.pdf.   And to the extent that some of these provisions make certain changes to some agencies, such as to the Wisconsin Economic Development Corporation, enlargement of the board of directors will allow for greater representation and deeper expertise to allow the agency to develop and implement economic programs to assist companies that are investing and creating jobs in Wisconsin, consistent with the agency's purpose.   *See* WISCOIN LEGISLATIVE COUNCIL, MEMO: 2011 WISCONSIN ACT 7 (Feb. 15, 2011), *available at* https://docs.legis.wisconsin.gov/2017/related/lcactmemo/act007.

*Codification of Certain Federally-Approved Plans and Other Regulations*.   The Legislature also codified in Wisconsin law certain plans that have already been approved by the relevant federal agencies, as well as codifying into law certain prior administrative regulations.   *See supra* pp. 6–7.   Such codification forwards the interests in the stability of law so that the public does not have to worry about programs that are already federally approved and/or codified in regulation being withdraw.   *See Nordlinger v. Hahn*, 505 U.S. 1, 12–13 (1992) (recognizing "continuity[] and stability" as legitimate interests).   By writing these previously executive decisions into the books

of Wisconsin law, these provisions preserve the traditional understanding of separation of powers: important policy decisions to be made by the legislature, leaving administrative agencies and the executive to enforce what the legislature has decided is in the public interest.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

*Prohibition on Certain Re-Nominations*.  These provisions forward the public interest by avoiding a wasteful practice of the re-nomination of individuals whom the State Senate has already concluded should not be confirmed for a particular position.

*Changes to Wisconsin Voting Law*.  Most of these provisions increase the availability of voting options for military and overseas voters.  *See supra* pp. 7–8.  Some of these provisions codify preexisting regulations relating to Wisconsin's voter ID law, and thus serve to advance the interest in stability.  *See Nordlinger*, 505 U.S. at 12–13.  For example, the only provision here that Plaintiffs specifically cite, Compl. ¶ 60 (referencing Section 91 of Act 369)—which codifies a regulation that provides an identification card if it concludes that it is "more likely than not" that an applicant's petition is correct—is rational and hardly turns Wisconsin into a "dictator[ship]." *Risser*, 930 F.2d at 553.

*Regulation of Guidance Documents*. These provisions, which Plaintiffs do not even mention, forward the legitimate interest in transparency and accountability by subjecting guidance documents issued by agencies to the well-respected strictures of notice-and-comment and judicial review.  *See Int'l Union, UMWA v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (explaining the numerous benefits to the public interest from the notice-and-comment procedure).

*Codification of the Elimination of Agency Deference*.  These provisions, which Plaintiffs do not discuss, merely codify the Wisconsin Supreme Court's decision to eliminate agency deference, consistent with the concerns that numerous respected jurists have expressed about this

doctrine. *See Michigan v. EPA*, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring); *Guitierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1158 (10th Cir. 2016) (Gorsuch, J., concurring); *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 539 (D.C. Cir. 2017) (Brown, J., concurring); *Egan v. Del. River Port Auth.*, 851 F.3d 263, 278 (3d Cir. 2017) (Jordan, J., concurring in the judgment); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2150 (2016).

## II.   This Court Should Deny Plaintiffs' Motion For A Preliminary Injunction

To obtain a preliminary injunction, Plaintiffs have the burden of demonstrating three mandatory elements: (1) that they "will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "some likelihood of success on the merits." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). In the event Plaintiffs make this threshold showing, "the court must engage in a balancing analysis, to determine whether the balance of harms favors the moving party or whether the harm to the other parties or to the public sufficiently outweighs the movant[s'] interests." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). A preliminary injunction is "an extraordinary remedy," *id.*, which constitutes "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it," *Girl Scouts*, 549 F.3d at 1085 (citation omitted).

### A.   Plaintiffs Have No Likelihood Of Success On The Merits

As Legislative Defendants explained in Part I, *see supra* pp. 9–28, this Court should dismiss this lawsuit for multiple reasons, and Plaintiffs have no possibility of success on the merits. Legislative Defendants responded to the merits arguments in Plaintiffs' Motion for a Preliminary Injunction in Part I, and fully incorporate all of those responses here.

**B.   Plaintiffs Have Failed To Establish Irreparable Harm, And, In Any Event, An Injunction Would Do Far More Harm Than Good To The Public Interest**

A court may only grant a preliminary injunction when necessary to prevent irreparable harm, *see Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011), and where such an injunction would forward the public interest, *see Whitaker*, 858 F.3d at 1044.  Under these equitable principles, an injunction is unlawful if it is "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *accord Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) ("[A] court abuses its discretion where the scope of injunctive relief 'exceeds the extent of the plaintiff's protectible rights.'" (citation omitted)).

In the present case, Plaintiffs have not attempted to carry their burden of showing that each of the dozens of provisions that they purport to challenge imposes irreparable harm upon them, much less that remedying this irreparable harm would outweigh the public interest harms from the issuance of injunctive relief.  Instead, they cite a couple of these provisions that impact the authority of politicians whom Plaintiffs support—which is not even constitutionally cognizable harm to Plaintiffs themselves, *see supra* pp. 11–13—and then rely upon the high-level principle that all constitutional violations are irreparable.  *See* PI Mot. 28.  But injunctive relief is an "extraordinary remedy," *Whitaker*, 858 F.3d at 1044, meaning that any injunction is unlawful unless it is carefully crafted to address *specific* irreparable harm that the plaintiffs have proven that they will suffer, *see Gill*, 138 S. Ct. at 1934.  Plaintiffs fail entirely to carry this substantial, extraordinary burden, not even discussing either irreparable harm or the public interest for most of the provisions that they seek to have enjoined.  *See supra* pp. 13–14.

Meanwhile, a preliminary injunction would impose significant harms on the public. The provisions at issue in this case—from those expanding the voting rights of overseas servicemembers to the modest adjustments in Wisconsin's separation of powers framework to the notice-and-comment and judicial review provisions for guidance documents—are in place and operating today. Enjoining these provisions would unsettle ongoing practices, including undermining administrative agencies' ability to meet the July 1, 2019, statutory deadline for putting all guidance documents through public notice-and-comment, *see* WIS. STAT. § 227.112, causing confusion in litigation where the Legislature is defending state law as intervenor, *League of Women Voters of Wisconsin v. Knudson*, No. 2019CV000084 (Wis. Cir. Ct. 2019), and undermining the ongoing work of joint legislative committees. More generally, a preliminary injunction would cause needless confusion because Plaintiffs are so exceedingly unlikely to prevail in this case. A preliminary injunction would result in numerous provisions going out of operation for a couple of weeks or months, with the Attorney General, the Governor and administrative agencies making an untold number of decisions implicated by these provisions. These interim decisions are certain to be called into immediate doubt when all of the provisions here are upheld on final judgment, against this entirely unprecedented and meritless lawsuit.

## CONCLUSION

This Court should grant the Legislative Defendants' Motion to Dismiss and deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: March 14, 2019

**TROUTMAN SANDERS LLP**

By: /s/ Misha Tseytlin
Misha Tseytlin
State Bar No. 1102199
TROUTMAN SANDERS LLP
1 N. Wacker Drive, Ste. 2905
Chicago, IL 60606
Telephone: (608) 999-1240
Facsimile: (312) 759-1939
E-mail: misha.tseytlin@troutman.com

*Counsel for Legislative Defendants*