## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

THE DEMOCRATIC PARTY OF WISCONSIN,
COLLEEN ROBSON; ALEXIA SABOR; PETER
KLITZKE; DENIS HOSTETTLER, JR.; DENNIS
D. DEGENHARDT; MARCIA STEELE; NANCY STENCIL;
and LINDSAY DORFF,

                 Plaintiffs,               **Civil Action No.:**  19-cv-142-jdp

        -against-               **Hon. James D. Peterson**

ROBIN VOS, in his official capacity as speaker of the
Wisconsin State Assembly; SCOTT L. FITZGERALD,
in his official capacity as majority leader of the Wisconsin
State Senate; ALBERTA DARLING, in her official capacity
as co-chair of the Wisconsin Joint Committee on Finance;
JOHN NYGREN, in his official capacity as co-chair of the
Wisconsin Joint Committee on Finance; ROGER ROTH,
in his official capacity as President of the Wisconsin State Senate;
JOAN BALLWEG, in her official capacity as co-chair of the
Wisconsin Joint Committee for Review of Administrative Rules;
STEPHEN L. NASS, in his official capacity as co-chair of the
Wisconsin Joint Committee for Review of Administrative Rules;
JOEL BRENNAN, in his official capacity as Secretary
of the Wisconsin Department of Administration;
TONY EVERS, in his official capacity as Governor of the State
of Wisconsin, and JOSHUA L. KAUL, in his official capacity
as Attorney General of the State of Wisconsin,

                 Defendants.

## BRIEF OF CONSTITUTIONAL LAW SCHOLARS AS
## *AMICI CURIAE* SUPPORTING PLAINTIFFS

Patrick O. Patterson, SBN 1014157
Law Office of Patrick O. Patterson, S.C.
7481 N. Beach Dr.
Fox Point, WI 53217
popatterson@gmail.com
T: (414) 704-1896

Deana K. El-Mallawany (*pro hac vice* forthcoming)
The Protect Democracy Project, Inc.
125 Walnut St., Ste. 202
Watertown, MA 02472
deana.elmallawany@protectdemocracy.org
T: (202) 579-4582 | F: (929) 777-8428

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 2

ARGUMENT .................................................................................................................. 4

I.      It is well within the Court's jurisdiction and competency to determine
        whether Wisconsin Acts 369 and 370 violate the Guarantee Clause.................................. 4

II.     The political question doctrine does not foreclose judicial review of this case.................. 7

        1.      The Guarantee Clause does not commit resolution of the
                issue to Congress.................................................................................................... 7

        2.      There are judicially manageable standards to resolve whether
                Wisconsin Acts 369 and 370 unconstitutionally deprive the state's
                citizens of a republican form of government. .......................................................... 8

        3.      This dispute can be resolved without judicial policymaking. .............................. 11

        4.      The remaining three *Baker* factors do not preclude judicial review. ................... 12

CONCLUSION .............................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ad Hoc Comm. on Judicial Admin. v. Massachusetts*,
488 F.2d 1241 (1st Cir. 1973) ................................................................12

*Attorney General of Michigan ex rel. Kies v. Lowrey*,
199 U.S. 233 (1905) ..............................................................................4

*Baker v. Carr*,
369 U.S. 186 (1962) ..................................................................... *passim*

*Cohens* v. *Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ...............................................................12

*Forsyth v. Hammond*,
166 U.S. 506 (1897) ..............................................................................4

*Goldwater v. Carter*,
444 U.S. 996 (1979) ............................................................................12

*Hickenlooper v. Kerr*,
135 S. Ct. 2927 (2015) ...........................................................................5

*In re Duncan*,
139 U.S. 449 (1891) ...........................................................................4, 9

*Japan Whaling Ass'n v. American Cetacean Soc.*,
478 U.S. 221 (1986) ............................................................................11

*Judge v. Quinn*,
624 F.3d 352 (7th Cir. 2010) ..................................................................7

*Kerpen v. Metro Wash. Airports Auth.*,
907 F.3d 152 (4th Cir. 2018) ..................................................................5

*Kerr v. Hickenlooper*,
744 F.3d 1156 (10th Cir. 2014) ...................................................... *passim*

*Largess v. Supreme Judicial Court for the State of Massachusetts*,
373 F.3d 219 (1st Cir. 2004) ...................................................................6

*Luther v. Borden*,
  48 U.S. (7 How.) 1 (1849) ....................................................................................4, 5, 6

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..........................................................................................11

*Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of the Interior*,
  255 F.3d 342 (7th Cir. 2001) ............................................................................................7

*Minor v. Happersett*,
  88 U.S. (21 Wall.) 162 (1875) .........................................................................................4

*New York v. United States*,
  505 U.S. 144 (1992)...................................................................................................4, 5, 6

*Orlando v. Laird*,
  443 F.2d 1039 (2d Cir. 1971)..........................................................................................12

*Pacific States Telephone & Telegraph Co. v. Oregon*,
  223 U.S. 118 (1912)....................................................................................................4, 5

*Plessy v. Ferguson*,
  163 U.S. 537 (1896).........................................................................................................4

*Reynolds v. Sims*,
  377 U.S. 533 (1964).........................................................................................................5

*Risser v. Thompson*,
  930 F.2d 549 (7th Cir. 1991) ...........................................................................................6

*Schroder v. Bush*,
  263 F.3d 1169 (10th Cir. 2001) ......................................................................................12

*Travis v. Reno*,
  163 F.3d 1000 (7th Cir. 1998) .........................................................................................6

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012)................................................................................................. *passim*

**Constitutional Provisions**

U.S. Const. art. IV, § 4................................................................................................2, 8

iii

**Other Authorities**

Akhil Reed Amar, *The Central Meaning of a Republican Government:*
  *Popular Sovereignty, Majority Rule, and the Denominator Problem*,
  65 U. Colo. L. Rev. 749 (1994) ............................................................4, 10

Arthur E. Bonfield, *The Guarantee Clause of Article IV, Section 4:*
  *A Study in Constitutional Desuetude*,
  46 Minn. L. Rev. 513 (1962) ...............................................................5, 10

David Leonhardt, *How Alarmed Should We Be About Wisconsin?*,
  N.Y. Times (Dec. 10, 2018), https://www.nytimes.com/2018/12/10/opinion/wisconsin-
  republicans-democracy.html (last visited Apr. 3, 2019) .........................................13

Deborah Jones Merritt, *The Guarantee Clause and State Autonomy:*
  *Federalism for a Third Century*,
  88 Colum. L. Rev. 1 (Jan. 1988) ...................................................................5

Erwin Chemerinsky, *Cases under the Guarantee Clause Should Be Justiciable*,
  65 U. Colo. L. Rev. 849 (1994) ..............................................................8, 10

The Federalist No. 22 (Alexander Hamilton),
  1788 WL 350 ..................................................................................9

The Federalist No. 39 (James Madison),
  1787 WL 453 ..................................................................................9

John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review*
  (Harvard Univ. Press, 1980) ......................................................................5

Laurence H. Tribe, *American Constitutional Law*
  (West Academic Publishing, 2d ed. 1988)............................................................5

Tara Golshan, *North Carolina wrote the playbook Wisconsin and*
  *Michigan are using to undermine democracy*,
  Vox (Dec. 5, 2018), https://www.vox.com/policy-andpolitics/2018/12/5/18125544/north-
  carolina-power-grab-wisconsin-michigan-lame-duck (last visited Mar. 26, 2019) .................13

William M. Wiecek, *The Guarantee Clause of the U.S. Constitution*
  (Cornell Univ. Press, 1972) ...............................................................5, 8, 9

## STATEMENT OF INTEREST OF *AMICI CURIAE*

Amici are professors and scholars of constitutional law.  Their names are below, with institutional affiliations listed for identification purposes only.  As legal experts, Amici have a professional interest in ensuring that the Guarantee Clause is properly construed in accordance with its text, history, and purpose.  They offer a scholarly perspective on the justiciability issues raised in the pending Motion to Dismiss and Motion for Preliminary Injunction.

Ethan J. Leib is the John D. Calamari Distinguished Professor of Law at Fordham Law School.  He has a Ph.D. in Political Science and a J.D. from Yale University.  He has taught Constitutional Law, Legislation & Regulation, and Contracts—and has written widely on public law topics, including an article about the Guarantee Clause.

Peter M. Shane is the Jacob E. Davis and Jacob E. Davis II Chair in Law at Ohio State University's Moritz College of Law.  He is an expert in constitutional and administrative law, who writes extensively on separation of powers issues and the role of courts and the rule of law in sustaining democracy.  Among his other work, Professor Shane is the author of *Madison's Nightmare: How Executive Power Threatens American Democracy* (U. of Chicago Press 2009).

William M. Wiecek is the Congdon Professor of Public Law, Emeritus, at Syracuse University College of Law.  He is an expert in legal and constitutional history.  Professor Wiecek has written extensively on republicanism, the United States Supreme Court and the Guarantee Clause.  Among his other work, Professor Wiecek's scholarship includes *The Guarantee Clause of the U.S. Constitution* (1972).

## SUMMARY OF ARGUMENT

The Guarantee Clause of the U.S. Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican form of Government."[1]  At issue in this case is whether state legislation that strips power from newly elected executive officials and prevents them from fulfilling certain campaign pledges to voters violates the Guarantee Clause.

In 2018, Wisconsin voters elected a new Governor and Attorney General who committed to wield the executive power of their offices to bring about policy changes ranging from expanding Medicaid, to defending the Affordable Care Act and reforming the Wisconsin Economic Development Corporation ("WEDC"), among other things.  In the aftermath of the election, but before the newly elected statewide officials were sworn in, the Wisconsin legislature passed Acts 369 and 370. These Acts removed or abridged numerous powers traditionally held by the Governor and Attorney General, and thereby stymied the new officials' capacity to bring about the changes sought by the voters.  The legislation curtailed the incoming administration's ability to carry out the will of the voters in many ways, including by restricting the Governor's capacity to revise relevant Medicaid rules and regulations, rescinding the Attorney General's discretion to withdraw from the lawsuit challenging the Affordable Care Act, and limiting the Governor's authority to appoint new officers to the WEDC.

This brief argues that the court should reach the merits of whether Wisconsin Acts 369 and 370 violate the constitutional guarantee of a republican form of government by depriving Wisconsin voters of their electoral choices.  It proceeds in two parts.  Part I explains why the Guarantee Clause claim is justiciable on the facts of this case.  Part II spells out why the political question doctrine is not applicable to the Plaintiffs' Guarantee Clause claim.

---

[1] U.S. Const. art. IV, § 4.

The Supreme Court has made plain that some Guarantee Clause claims are justiciable. This is one such case. A republican government is one in which the people are sovereign. Post-election legislation to nullify voter choice strikes at the heart of the Guarantee Clause's protection of popular sovereignty. This Court need not define every contour of a republican form of government, nor evaluate every aspect of Wisconsin's state government to answer the narrow question presented here: whether two specific pieces of legislation that thwart the will of the Wisconsin voters are unconstitutional under the Guarantee Clause.

The political question doctrine does not preclude this court's consideration of the Plaintiffs' Guarantee Clause claim. Judicial review of Wisconsin Acts 369 and 370 does not raise the political question concerns articulated in *Baker v. Carr*, 369 U.S. 186 (1962) and more recently in *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012). Indeed, analyzing the constitutionality of statutes is a core function of the judiciary. This Court can evaluate the constitutionality of the legislation stripping executive powers from the Governor and Attorney General without resorting to judicial policymaking or in any way adjudicating the specific policy reforms the executive officials sought to bring to bear. There is also ample textual and historical evidence to guide this court in crafting a judicially manageable standard for determining whether Wisconsin Acts 369 and 370 violate the constitutional guarantee of a republican form of government.

For these reasons, the Court should proceed to the merits of the Plaintiffs' Guarantee Clause claim.

**ARGUMENT**

**I.    It is well within the Court's jurisdiction and competency to determine whether Wisconsin Acts 369 and 370 violate the Guarantee Clause.**

The Supreme Court has long recognized that some claims under the Guarantee Clause are justiciable.  The early "Court addressed the merits of claims founded on the Guarantee Clause without any suggestion that the claims were not justiciable."  *New York v. United States*, 505 U.S. 144, 184–85 (1992) (citing *Attorney General of Michigan ex rel. Kies v. Lowrey*, 199 U.S. 233, 239 (1905); *Forsyth v. Hammond*, 166 U.S. 506, 519 (1897); *In re Duncan*, 139 U.S. 449, 461–62 (1891); *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 175–76 (1875); *Plessy v. Ferguson*, 163 U.S. 537, 563–64 (1896) (Harlan, J., dissenting)).

The Court's findings in cases like *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), and *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912), that the Guarantee Clause claims in those specific matters were nonjusticiable political questions do not render all Guarantee Clause claims *per se* nonjusticiable.  *See New York*, 505 U.S. at 185 (criticizing opinions that allowed the "limited holding" in *Luther* to "metamorphose[] into the sweeping assertion that 'violation of the great guaranty of a republican form of government in States cannot be challenged in the courts'").[2]  Both cases, moreover, are distinguishable from the case before this Court.  Both *Luther* and *Pacific States Telephone* involved wholesale challenges to state government structures or constitutions, rather than discrete inquiries into the constitutionality of particular pieces of legislation.  In *Luther*, the Court was asked to determine

---

[2] A close reading of *Luther* underscores that the *New York* Court was right to criticize such a wide-reaching interpretation of that case.  As Professor Akhil Reed Amar has explained it, "the real question in *Luther* was akin to the international question of 'recognition'—a question committed to the federal political branches under our Constitution."  Akhil Reed Amar, *The Central Meaning of a Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 U. Colo. L. Rev. 749, 776 (1994).

4

the legitimacy of two opposing state governments.  In *Pacific States Telephone*, the Court was

asked to determine the legitimacy of an entire state constitution.  None of the issues here require

this Court to reach the kind of expansive questions found not to be justiciable in *Luther* and

*Pacific States Telephone.*

Indeed, the Supreme Court has recognized that "[s]*ome* questions raised under the

Guarantee Clause are nonjusticiable," *Reynolds v. Sims*, 377 U.S. 533, 582 (1964) (emphasis

added), and that "perhaps not all claims under the Guarantee Clause present nonjusticiable

political questions," *New York*, 505 U.S at 185.[3]  Since *New York,* several federal courts have

found claims challenging state laws and structures under the Guarantee Clause to be justiciable.

*See, e.g.*, *Kerpen v. Metro Wash. Airports Auth.*, 907 F.3d 152, 163 (4th Cir. 2018) (finding that

the "distinguishing feature of a republican form of government is the right of the people to

choose their own officers for governmental administration, and pass their own laws" and that the

"Guarantee Clause is not violated when States . . . retain the ability to set their legislative

agendas and when state government officials remain accountable to the local electorate" (internal

quotations and citations omitted)); *Kerr v. Hickenlooper*, 744 F.3d 1156, 1176 (10th Cir. 2014)

("reject[ing] the proposition that *Luther* and *Pacific States* brand all Guarantee Clause claims as

per se non-justiciable"), *vacated and remanded on other grounds*, 135 S. Ct. 2927 (2015);

---

[3] The Court also noted that numerous legal scholars have "suggested that courts should address the merits of [Guarantee Clause] claims, at least in some circumstances."  *New York*, 505 U.S. at 185 (citing Laurence H. Tribe, *American Constitutional Law* 398 (West Academic Publishing, 2d ed. 1988); John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 122-123 (Harvard Univ. Press, 1980); William M. Wiecek, *The Guarantee Clause of the U.S. Constitution* 300 (Cornell Univ. Press, 1972); Deborah Jones Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century*, 88 Colum. L. Rev. 1, 70-78 (Jan. 1988); Arthur E. Bonfield, *The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude*, 46 Minn. L. Rev. 513, 560-565 (1962)).

*Largess v. Supreme Judicial Court for the State of Massachusetts*, 373 F.3d 219, 226-27 (1st Cir. 2004) (engaging in lengthy discussion of text, history, and precedent interpreting the Guarantee Clause, but ultimately finding no violation based on the facts of the case).

The Seventh Circuit decisions in *Risser v. Thompson*, 930 F.2d 549 (7th Cir. 1991) and *Travis v. Reno*, 163 F.3d 1000 (7th Cir. 1998) do not bar the Court's consideration of this case. First, *Risser* was decided before *New York*. Writing for the Seventh Circuit panel in *Risser*, Judge Posner relied on the Supreme Court decisions that roughly one year later the Supreme Court critiqued in *New York* for turning *Luther*'s "limited holding . . . into the sweeping assertion" that claims under the Guarantee Clause were nonjusticiable. *New York*, 505 U.S. at 185; *see Risser*, 930 F.2d at 552. Judge Posner's conclusion that the nonjusticiability of those claims was "too well entrenched to be overturned at our level of the judiciary," while reasonable in 1991, was displaced by *New York* in 1992. *Id.*

Second, the Seventh Circuit's *Travis* decision is not on point. In that case, the state of Wisconsin unsuccessfully challenged the constitutionality of a federal statute, not a state statute. Also, the statute in that case, unlike the Wisconsin legislation in this matter, left the state's "internal and political affairs alone." 163 F.3d at 1008. In contrast, the present claims address core concerns of popular rule and the legality of discrete legislative actions alleged to subvert elected officials' authority to implement voters' electoral choices.

Plaintiffs' claims require adjudication of the core popular sovereignty principles undergirding the Guarantee Clause. On these facts, the Court should reach the question of whether legislative efforts that are alleged to curb elected officials' powers for the purpose of nullifying election results violate the guarantee of a republican form of government.

**II.      The political question doctrine does not foreclose judicial review of this case.**

The political question doctrine "identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh, . . . or have been committed by the Constitution to the exclusive, unreviewable discretion of the executive and/or legislative—the so-called 'political'—branches of the federal government." *Judge v. Quinn*, 624 F.3d 352, 358 (7th Cir. 2010) (quoting *Miami Nation of Indians of Indiana*, *Inc. v. U.S. Dept. of the Interior*, 255 F.3d 342, 347 (7th Cir. 2001) (alterations in original)).  To determine whether a case presents a political question, courts typically apply the six tests announced in *Baker*.[4]  Under *Baker*, judges are prevented from deciding cases that involve:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.  None of the six factors counsel in favor of applying the political question doctrine here.

1.      *The Guarantee Clause does not commit resolution of the issue to Congress.*

The Guarantee Clause is the Constitution's assurance and command that every state, including Wisconsin, must have a republican form of government.  Under Article IV, Section 4

---

[4] In *Zivotofsky*, the Court seemed to limit the scope of the political question doctrine to only those cases "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"  566 U.S. at 195 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  Whether using the narrower *Zivotofsky* test or the more robust *Baker* test, the political question doctrine does not preclude judicial resolution of this case.

of the Constitution: "The United States shall guarantee to every State in this Union a Republican Form of Government . . . ."  Because of its location in Article IV, enforcement of the clause is not the exclusive responsibility of any single branch of the federal government, but rather is entrusted to all of them, including the judiciary.  At a minimum, a natural reading of the Clause is that it includes the courts in the command to guarantee a republican form of government in the states.  As a Tenth Circuit decision noted, the Clause "commits the 'United States'—which would normally be read as including the Article III courts—to the preservation of republican government in the states."  *Kerr*, 744 F.3d at 1176.  In addition, both scholars[5] and the *Kerr* court reasoned that the placement of the Guarantee Clause in Article IV, not Article I, further demonstrates that it is not textually committed to Congress.  *See id.*  While the guarantee of a republican government is a constitutional responsibility that Congress may choose to carry out, it is clear that enforcement of the Guarantee Clause is not exclusively committed to Congress.

2.      *There are judicially manageable standards to resolve whether Wisconsin Acts 369 and 370 unconstitutionally deprive the state's citizens of a republican form of government.*

The Guarantee Clause, like many open-ended provisions in the Constitution, is amenable to the creation of judicially manageable standards.  There is no principled reason to find the guarantee of a "republican form of government" to be any more bereft of manageable standards than other broad constitutional commands such as the fundamental right to "due process" or "equal protection."

---

[5] *See, e.g.*, Erwin Chemerinsky, *Cases under the Guarantee Clause Should Be Justiciable*, 65 U. Colo. L. Rev. 849, 875–78 (1994) (discussing why "it is very unlikely that Congress will act under the Clause"); Wiecek, *supra* note 3, at 76-77.

To interpret and apply constitutional provisions, courts regularly look to historical evidence.  *See Zivotofsky*, 566 U.S. at 201 ("Resolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical arguments put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do.").  This is particularly true where, as here, there is sparse pertinent precedent.  As the Tenth Circuit has noted, there are "sources that courts have relied on for centuries to aid them in constitutional interpretation" such as "the Federalist Papers, founding-era dictionaries, records of the Constitutional Convention, and other papers of the founders."  *Kerr*, 744 F.3d at 1178.

While the precise contours of republicanism may be subject to debate, the Framers understood a republican government to refer, at a minimum, to a government chosen by the people to exercise power on the people's behalf.  The "distinguishing feature" of a republican form of government "is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan*, 139 U.S. at 461.  The Framers of our Constitution sought to ensure that government both derived its powers from and reflected the will of the people.  As James Madison wrote in Federalist No. 39, a republic is "a government which derives all its powers directly or indirectly from the great body of the people."[6]  And as Alexander Hamilton explained in Federalist No. 22, the "fundamental maxim of republican government . . . requires that the sense of the majority should prevail."[7]  Thus, it was not enough for a government to merely go through the motions of

---

[6] 1788 WL 453, *1.
[7] 1787 WL 350, *2; *see also* Wiecek, *supra* note 3, at 67–68 ("The guarantee clause emerged from the pages of The Federalist with its assurance of popular control of government, rule by majorities in the states with safeguards for the rights of minorities, and emphasis on the substance as well as the form of republican government enhanced and more explicit than in the Philadelphia debates.").

electing representatives; those representatives needed actually to enact the will of those who had elected them.

Other sources confirm this original public meaning.  For instance, in South Carolina's ratifying convention, Charles Pinckney described a republican government as one where "the people at large, *either collectively or* by representation, form the legislature."[8]  Samuel Johnson's 1786 dictionary defined "Republican" as "Placing the government in the people."[9]  Similarly, Thomas Sheridan's dictionary defined "republican" in the same way.[10]

Indeed, the popular control requirement follows from the underlying logic of prohibiting monarchy.  As Dean Erwin Chemerinsky has concluded:

> At a minimum, the guarantee of a republican form of government was meant to protect against a monarchy. What was so objectionable about a monarchy? In a monarchy, citizens do not get to choose their rulers, power is fixed and inherited; in a republican form of government, the people ultimately retain sovereignty and choose their officeholders. In other words, the key features of a republican form of government are a right to vote and a right to political participation.[11]

In a republican government, sovereignty lies with the people who get to choose officials who will effectuate their will.

As the people's representatives, state legislatures cannot, consistent with the Guarantee Clause, override electoral results by removing power from incoming elected executives in contravention of the people's will.  When faced with these circumstances, courts could, for example, apply an anti-entrenchment standard.  Under this standard, during the interim between a state election and a transfer of party power, it would violate the Guarantee Clause for a

---

[8] Amar, *supra* note 2, at 758.
[9] Bonfield, *supra* note 3, at 527.
[10] Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789) (unpaginated).
[11] Chemerinsky, *supra* note 5, at 867-68.

legislative body controlled by the losing party to limit the existing powers of the incoming state executive officers.

Whether applying this or another standard, it is important for this Court to reach the merits of the case. In order to develop judicially manageable standards, "courts must be permitted to reach the state of litigation where such standards are developed." *Kerr*, 744 F.3d at 1179. Otherwise the lack of a manageable standard becomes simply a self-fulfilling prophecy.

        *3.*       *This dispute can be resolved without judicial policymaking.*

Resolving the constitutional question of whether the Wisconsin legislature acted outside the bounds of a republican form of government does not require the Court to engage in judicial policymaking. This case does not require the Court to evaluate the political wisdom of the new Wisconsin Governor's and Attorney General's campaign promises to the people of Wisconsin. Nor does it require the Court to evaluate or adjudicate competing policy views on whether to preserve the Affordable Care Act, to expand Medicaid, or to reform the WEDC. Rather, the narrow issue for this Court to resolve is the constitutionality of laws that remove existing powers from the Governor and Attorney General to prevent them from fulfilling their campaign pledges to the voters who elected them to office.

Determining the lawfulness of Acts 369 and 370 falls squarely within the court's duty to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). As the Supreme Court has repeatedly affirmed, "courts cannot avoid their responsibility merely 'because the issues have political implications.'" *Zivotofsky*, 566 U.S. 189, 196 (quoting *INS* v. *Chadha*, 462 U.S. 919, 943 (1983)); *see also Baker*, 369 U.S. at 217 ("The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."); *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 229 (1986) (noting

that "not every matter touching on politics is a political question").  This includes even those

cases that courts "would gladly avoid."  *Zivotofsky*, 566 U.S. at 194–95 (quoting *Cohens* v.

*Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

Further, this case is considerably different from other lawsuits that have failed at the third

"policy determination" prong in *Baker*.  The crucial distinction is that those cases involved

scenarios where the court was asked to stray from its core competency of legal analysis and wade

into technical policy determinations relating to issues such as "market conditions, budgeting

priorities, or foreign policy concerns."  *Kerr*, 744 F.3d at 1179 (contrasting *Schroder v. Bush*,

263 F.3d 1169, 1175 (10th Cir. 2001) ("Courts are ill-equipped to make highly technical,

complex, and on-going decisions regarding how to maintain market conditions, negotiate trade

agreements, and control currency."); *Ad Hoc Comm. on Judicial Admin. v. Massachusetts*, 488

F.2d 1241, 1245 (1st Cir. 1973) (concluding that "the financing and, to an important extent, the

organization of the judicial branches" requires a policy determination); *Orlando v. Laird*, 443

F.2d 1039, 1043 (2d Cir. 1971) ("[D]ecisions regarding the form and substance of congressional

enactments authorizing hostilities are determined by highly complex considerations of

diplomacy, foreign policy, and military strategy inappropriate to judicial inquiry.")).

    *4.*    *The remaining three* Baker *factors do not preclude judicial review.*

As the *Kerr* court stated, the final three factors are "best understood as promoting

separation-of-powers principles in cases featuring an action on an issue by a coordinate branch."

744 F.3d at 1181–82 (citing *Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) (Powell, J.,

concurring) ("[T]he political-question doctrine rests in part on prudential concerns calling for

mutual respect among the three branches of Government.")).  Ruling on the constitutionality of

the legislation at issue in this case would not show a lack of due respect for the Wisconsin

legislature under the fourth *Baker* prong.  Judicial review of legislation is a cornerstone of our democratic system of checks and balances, not an expression of disrespect for the legislature. The fifth *Baker* test is also not at issue here.  There is no unusual need for unquestioning adherence to a political decision already made.  The political decision made here resulted in Acts 369 and 370, and there is no need for unquestioning adherence to these laws if they are found to be unconstitutional.  Finally, as to the sixth *Baker* factor, any conflicts arising between a judicial decision regarding the constitutionality of a law and a legislature's political determinations or pronouncements with respect to the legislation are a standard part of the judicial review process and a proper exercise of the Court's judicial authority in our coordinate system of government.

## CONCLUSION

At its core, the Guarantee Clause protects popular sovereignty and dictates that the voters have the power to choose the officials who will effectuate their will.  The acts of the Wisconsin legislature are antithetical to this conception of a republican government.  Indeed, they are a hallmark of democratic decline.[12]  Even more concerning, the Wisconsin legislature's acts follow a trend started by the North Carolina legislature after the 2016 statewide election and joined by the Michigan legislature after the 2018 statewide election.[13]  If the Guarantee Clause is to have any force, it should protect against this type of threat to the health of our republican government.

---

[12] *See* David Leonhardt, *How Alarmed Should We Be About Wisconsin?*, N.Y. Times (Dec. 10, 2018), https://www.nytimes.com/2018/12/10/opinion/wisconsin-republicans-democracy.html (last visited Apr. 3, 2019).

[13] *See* Tara Golshan, North Carolina wrote the playbook Wisconsin and Michigan are using to undermine democracy, *Vox* (Dec. 5, 2018), https://www.vox.com/policy-andpolitics/2018/12/5/18125544/north-carolina-power-grab-wisconsin-michigan-lame-duck (last visited Mar. 26, 2019).

Dated: April 4, 2019                      Respectfully submitted,

                                          /s/ Patrick O. Patterson
                                          Patrick O. Patterson, SBN 1014157
                                          Law Office of Patrick O. Patterson, S.C.
                                          7481 N. Beach Dr.
                                          Fox Point, WI 53217
                                          popatterson@gmail.com
                                          T: (414) 704-1896

                                          Deana K. El-Mallawany (*pro hac vice* forthcoming)
                                          Protect Democracy Project
                                          125 Walnut St., Ste. 202
                                          Watertown, MA 02472
                                          deana.elmallawany@protectdemocracy.org
                                          T: (202) 579-4582 | F: (929) 777-8428