IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THE DEMOCRATIC PARTY OF WISCONSIN,
COLLEEN ROBSON, ALEXIA SABOR, PETER
KLITZKE, DENIS HOSTETTLER, JR., DENNIS D.
DEGENHARDT, MARCIA STEELE, NANCY
STENCIL, and LINDSAY DORFF,

                   Plaintiffs,                  OPINION and ORDER

    v.

                                                             19-cv-142-jdp

ROBIN VOS, SCOTT L. FITZGERALD, ALBERTA
DARLING, JOHN NYGREN, ROGER ROTH, JOAN
BALLWEG, STEPHEN L. NASS, JOEL BRENNAN,
TONY EVERS, and JOSHUA L. KAUL,

                   Defendants.

---

This is another legal challenge to 2017 Wisconsin Act 369 and 2017 Wisconsin Act 370. These are the so-called "lame-duck" laws, passed by the Republican-controlled legislature after the November 2018 election, while Republican Scott Walker was still governor. The lame-duck laws restrict the authority of the executive branch in numerous ways, such as by limiting the governor's control over the Wisconsin Economic Development Corporation and by prohibiting the attorney general from settling some lawsuits without legislative approval.

The Democratic Party of Wisconsin and several of its members challenge the constitutionality of the lame-duck laws. Plaintiffs allege that the legislature acted with partisan intent to limit the power the newly elected governor, Tony Evers, and attorney general, Josh Kaul, both Democrats. Plaintiffs say that the lame-duck laws effectively changed the results of the election, Dkt. 64, at 5, and as a result violate the First Amendment, the Equal Protection Clause, and the Guarantee Clause of the United States Constitution.

Two motions are before the court: (1) plaintiffs' motion to preliminarily enjoin Acts 369 and 370, Dkt. 2; and (2) a motion to dismiss filed by defendants Joan Ballweg, Alberta Darling, Scott L. Fitzgerald, Stephen L. Nass, John Nygren, Roger Roth, and Robin Vos, all of whom are Wisconsin legislators, Dkt. 34. (The court will refer to these individuals as "the legislative defendants" for the remainder of the opinion.) Defendant Evers and defendant Joel Brennan (Secretary of the Wisconsin Department of Administration) have filed briefs in support of the motion for a preliminary injunction and in opposition to the motion to dismiss. Defendant Kaul has not taken a position on either motion.

There are many reasons to criticize the lame-duck laws. The legislative defendants don't dispute that the lame-duck laws were intended to limit the power of the newly Democratic executive officers and to consolidate power in the Republican-controlled legislature. But the role of a federal court is not to second-guess the wisdom of state legislation, or to decide how the state should allocate the power among the branches of its government. The court will deny the motion for a preliminary injunction and grant the motion to dismiss, because the plaintiffs are not entitled to any remedy under the United States Constitution. Any judicial remedy for the harms alleged in this case must come from the courts of Wisconsin. *See, e.g., SIEU, Local 1 v. Vos*, 2019AP622 (Wis. Sup. Ct. reviewed accepted April 19, 2019) (case before state supreme court alleging that Acts 369 and 370 violate Wisconsin Constitution's separation of powers doctrine).

ANALYSIS

A. Overview of the claims and defenses

Enacted in December 2018, 2017 Wisconsin Act 369 and 2017 Wisconsin Act 370 made dozens of changes to state law. Plaintiffs cite the following changes in their complaint:

- prohibiting the governor from renominating potential appointees who were already rejected by the legislature, 2017 Wis. Act 369, § 4;

- requiring the Department of Veterans Affairs to notify the legislature of certain transfers of funds, *id.* § 23;

- requiring legislative approval for the attorney general to withdraw from a lawsuit filed by state government, *id.* § 26;

- requiring legislative approval before the attorney general may settle lawsuits for injunctive relief, *id.* § 30;

- giving the legislature authority to suspend an administrative rule "multiple times," *id.* § 64;

- adding legislative appointees to the Wisconsin Economic Development Corporation, *id.*, § 82m;

- codifying administrative rules related to voter identification requirements, *id.* § 91;

- removing the governor's ability to appoint the chief executive officer of the Wisconsin Economic Development Corporation, *id.* § 102(2v);

- codifying administrative rules requiring drug testing for individuals applying for certain kinds of public assistance, 2017 Wis. Act 370, § 17;

- placing new conditions on funding for the Department of Health Services, *id.* §§ 10(6), 44(3)(b).

Plaintiffs challenge Acts 369 and 370 on three grounds. First, plaintiffs say that the Acts violate the Guarantee Clause, which states that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. Plaintiffs' Guarantee Clause theory has several components, but the gist is that the Acts violate

3

the Guarantee Clause because the purpose and effect of the Acts were "to blunt the electoral results" by transferring power from the executive to the legislature only after candidates from a rival party were elected as the governor and attorney general. Dkt. 1, ¶ 8 and Dkt. 3, at 17.

Second, plaintiffs raise claims under their First Amendment rights of free expression and association. Plaintiffs contend that the Acts violate the First Amendment in various ways, including by "retaliat[ing] against Plaintiffs due to their political views and the expression of their political preferences." Dkt. 1, ¶ 93. Plaintiffs' theory is that the legislature enacted Acts 369 and 370 to retaliate against those who voted for Evers and Kaul and to prevent those voters from "enact[ing] their policy preferences," which they had "spent years working to achieve." Dkt. 1, ¶ 92 and Dkt. 3, at 10.

Third, plaintiffs raise a claim under the Equal Protection Clause. As with the First Amendment claim, plaintiffs say that the legislature discriminated against them because of their political beliefs. Dkt. 1, ¶ 99. Plaintiffs also say that the Acts "dilute the power of Democratic voters' votes" by "by substantially changing, in the lame-duck session, the authorities of the" executive branch. *Id.*, ¶ 100 and Dkt. 3, at 23.

The legislative defendants move to dismiss plaintiffs' claims on three grounds: (1) plaintiffs lack standing to sue; (2) plaintiffs' claims present political questions that can't be resolved by a federal court; and (3) plaintiffs' allegations don't state a claim upon which relief may be granted. The court concludes that plaintiffs lack standing to sue on all of their claims because they haven't pointed to any concrete harms they have suffered or will suffer because of Acts 369 and 370. And even if the court were to accept plaintiffs' request to consider the injuries of the governor and attorney general, plaintiffs' claims would fail for other reasons. So

the court will grant the motion to dismiss in full, which moots plaintiffs' motion for a preliminary injunction.

B. **Standing**

   1. **Legal standard**

Standing is an "essential aspect" of the requirement that every plaintiff in federal court show that its complaint falls within the judicial power under Article III of the Constitution. *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). A plaintiff doesn't have standing unless he or she shows three things: (1) plaintiff suffered an injury in fact; (2) the injury is fairly traceable to the challenged conduct of the defendant; and (3) the injury is likely to be redressed by a favorable judicial decision. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). The injury must be an "invasion of a legally protected interest that is concrete and particularized," meaning that it "affects the plaintiff in a personal and individual way." *Id.* (internal quotations and alterations omitted). A plaintiff can't rely on a "generalized grievance about the conduct of government." *Id.* at 1931.

In determining whether a plaintiff has adequately pleaded the requirements for standing, the court applies the same standard that it applies to motions to dismiss for failure to state a claim: a complaint must contain sufficient factual matter, accepted as true, to plausibly allege each of the requirements for standing. *Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015). The court must draw reasonable inferences in favor of the plaintiff but may not accept conclusory allegations. *Id.* However, when, as in this case, the parties have submitted evidence outside the pleadings, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *St. John's United Church of Christ*

*v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007). In that situation, "the plaintiff bears the burden of coming forward with competent proof that standing exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009).

### 2. Plaintiffs' alleged injuries

A threshold problem for plaintiffs in meeting their burden to satisfy the requirements for standing is that Acts 369 and 370 do not restrict or regulate plaintiffs' conduct in any way. Rather, the laws at issue are restrictions on the governor and the attorney general, who are defendants, not plaintiffs. As the legislative defendants point out, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). This is because the causal connection between the government's conduct and the alleged harm tends to be more attenuated in those situations. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009); *DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005). Despite the legislative defendants' reliance on this aspect of *Lujan*, plaintiffs do not address it or explain why they believe that the causal relationship between the Acts and their alleged injuries is sufficiently direct to satisfy standing requirements. That is reason alone to conclude that plaintiffs haven't met their burden.

Another problem is that plaintiffs articulate many of their injuries at a high level of generality. For example, in their brief in opposition to the motion to dismiss, the individual plaintiffs describe their injuries as follows:

> [D]efendants diluted and retaliated against plaintiffs' exercise of their vote by enacting laws that disempowered the incoming administration from enacting [the] policy [that plaintiffs supported]. This conduct specifically and directly infringed plaintiffs' constitutional rights (1) to associate; (2) to express their views; (3) to advance their collective beliefs; (4) to not have their

6

> votes diluted; and (5) to live under a republican form of government.

Dkt. 37, at 11. But this is simply a summary of plaintiffs' legal theories; it is not a description of any "concrete and particularized" injuries that affect plaintiffs "in a personal and individual way." *Gill*, 138 S. Ct. at 1929.

The only identifiable harm alleged is that the legislature has prevented plaintiffs from enacting policies that they support. Specifically, they say that they voted for Evers and Kaul because of the policies the candidates promised to enact, but Acts 369 and 370 have prevented Evers and Kaul from keeping many of those promises. Dkt. 1, ¶¶ 2–7. But the Supreme Court has already rejected the view that a voter has a legally protected interest in advancing a particular policy, concluding that "the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable general interest common to all members of the public." *Gill*, 138 S. Ct. at 1931 (internal quotations omitted). Again, although the legislative defendants cite and rely on this holding from *Gill*, plaintiffs don't show how this principle would not apply directly to the harms they allege.

Plaintiffs name several other types of alleged harm throughout their complaint and briefs: (1) vote dilution; (2) emotional distress; (3) unequal treatment "targeting" plaintiffs; (4) resources expended by the Democratic Party; (5) future difficulties that the Democratic Party may experience. But none of these alleged harms are sufficient to give plaintiffs standing to sue.

### a. Vote dilution

Plaintiffs invoke the concept of "vote dilution," but they don't clearly explain what they mean by that. The Supreme Court has recognized vote dilution as an injury arising from the malapportionment of legislative districts. Those cases "require that each elector have the same

7

voting power, as measured by the number of votes required to elect each elected state official."
*Risser v. Thompson*, 930 F.2d 549, 553–54 (7th Cir. 1991). For example, a citizen's vote is diluted if legislative districts have significant population differences. *See Wesberry v. Sanders*, 376 U.S. 1, 7 (1964) (malapportioned maps "contract the value" of urban citizens' votes while "expand[ing]" the value of rural citizens' votes). Plaintiffs don't allege anything like that in this case. Rather, they explain their theory of vote dilution as follows:

> Wisconsin's voters thought they were voting for one thing—a Democratic administration with all the powers of the outgoing administration—and, after the election, the lame-duck Republican legislature gave them another—a Democratic administration with fewer powers, with powers core to the fulfilment of the candidates' campaign promises having been transferred to the gerrymandered legislature.

Dkt. 3, at 30. So plaintiffs appear to be alleging that their votes were diluted because the Act made it more difficult for them to achieve their favored policies. This is just a re-packaging of their interest in a specific policy agenda. Such a view of vote dilution has not been recognized by the Supreme Court or the court of appeals.

### b. Emotional distress

In their declarations, the individual plaintiffs discuss the way the Acts made them and others feel. Dkt. 4, ¶ 5 ("the excitement and energy of Democratic activists in my area was zapped"); Dkt. 5, ¶ 7 (the Acts "demoralized Wisconsin voters"); Dkt. 6, ¶ 6 ("many Democratic voters feel helpless"). That type of emotional harm might be understandable, but it doesn't qualify as an injury under the Constitution. *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 660 (7th Cir. 2015) ("Neither psychological harm produced by observation of conduct with which one disagrees nor offense at the behavior of government and a desire to

have public officials comply with one's view of the law constitutes a cognizable injury." (internal quotations omitted)).

### c. "Targeting"

Plaintiffs say that they have standing because "the Acts were passed to target Democrats and the Democratic Party because of the views expressed by their voters and candidates and the subsequent electoral victory of Evers and Kaul." Dkt. 37, at 15–16. But plaintiffs are confusing the requirements of standing with the merits of their claims. Evidence of legislative intent might be relevant to prove a violation of the First Amendment or the Equal Protection Clause, but it is the effect of the Acts on plaintiffs, not the intent of the legislature, that matters for standing. *See Gill,* 138 S. Ct. at 1932 ("The question at this point is whether the plaintiffs have established injury in fact. That turns on effect, not intent."). As discussed above, plaintiffs are not the "targets" of Acts 369 and 370 in the sense that those laws prohibit or require any action by plaintiffs; rather, the laws are directed at the governor and the attorney general. Even if it is true that the purpose of the law was to subject plaintiffs to unequal treatment, such a purpose doesn't provide a basis for standing unless it is coupled with concrete harm. *Johnson*, 783 F.3d at 666 ("[P]laintiffs . . . cannot rely on the theory that they have been injured by being treated unequally favorably in the abstract.").

### d. Resources expended by the party

Plaintiffs say that the Democratic Party "raised millions of dollars in support of the candidates and policies that [the party] promoted, undertook significant efforts to register voters, coordinated the activities of its members and candidates for office, conducted recruiting and fundraising activities, and conducted a number of other activities designed to obtain victory at the polls in 2018." Dkt. 37, at 11–12. Those costs may be concrete and

9

particularized, but they cannot provide a basis for standing because the party incurred them *before* Acts 369 and 370 were enacted. So the costs are not "fairly traceable" to the Acts and they could not be recouped by prevailing in this lawsuit.

### e. Future harm

Plaintiffs rely on a declaration by the Democratic Party chair, who predicts that the party will have greater difficulty attracting volunteers, recruiting candidates, and raising money because of the Acts. Dkt. 14. This theory of harm rests on a concurring opinion in *Gill*, in which Justice Kagan observed that a "disfavored party" subjected to gerrymandering could have standing to sue if the party "face[s] difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office" as a result of the gerrymander. 138 S. Ct. at 1938 (Kagan, J., concurring).

Justice Kagan's opinion was not adopted by a majority of the court. *See id.* at 1916 ("The reasoning of this Court with respect to the disposition of this case is set forth in this opinion and none other."). And the Court expressed skepticism of that theory of harm in *Rucho v. Common Cause* because such harm would be difficult to measure: "How much of a decline in voter engagement is enough to constitute a First Amendment burden? How many door knocks must go unanswered? How many petitions unsigned? How many calls for volunteers unheeded?" 139 S. Ct. 2484, 2504–05 (2019).

But even if this court treated Justice Kagan's opinion as controlling, it would not help plaintiffs for two reasons. First, Justice Kagan's theory was specific to gerrymandering, in which one party is directly targeting another: "By placing a state party at an enduring electoral disadvantage, the gerrymander weakens its capacity to perform all its functions." *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). Although plaintiffs allege that Acts 369 and 370 "target"

them as well, the connection is more tenuous because the Acts on their face are about the relationship between the state legislative and executive branches rather than the political parties per se. If the court were to recognize a loss of party enthusiasm as an injury in this context, it would give a political party standing to challenge any decision by a governmental body that could be viewed as demoralizing by the party's members.

Second, Justice Kagan's theory rested on an assumption that a political party could show that it had already been harmed in tangible ways. In this case, plaintiffs rely on nothing but conclusory assertions to support a view that the Acts will have an adverse effect on the party. That's not enough. "Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (internal quotations omitted). Rather, the harm must be "actual or imminent." *Id.* at 409. "Although 'imminence' is concededly a somewhat elastic concept," *Lujan*, 504 U.S. at 564, "there must be at least a substantial risk that such harm will occur." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1019–20 (7th Cir. 2016). Because plaintiffs have not adduced evidence or even alleged facts plausibly showing that the Democratic Party will suffer the harms identified by the party chair, they do not provide a basis for giving plaintiffs standing to sue in this case.

## C. Potential claims of Evers and Kaul

Plaintiffs contend that, if they "lack the requisite interest to establish standing, Governor Evers and Attorney General Kaul can supply the missing ingredient" because there is no dispute that Evers and Kaul are injured by Acts 369 and 370 Dkt. 37, at 13.[1] The

---

[1] Plaintiffs also say that the Democratic Party of Wisconsin has standing to assert the rights of Evers and Kaul because they are members of the party. Dkt. 37, at 12–13. But plaintiffs cite no authority for the view that a political party may assert the rights of an elected official, who

11

legislative defendants dispute that Evers and Kaul were injured, but defendants' argument on that point is dubious. They say that Acts 369 and 370 were passed into law before Evers and Kaul took office, so "they never had any federal right (or state law right, or any other kind of right) to the powers that previous occupants of their offices had." Dkt. 40, at 9. But the laws were passed after the elections and just before the previous governor and attorney general left office, so it was only Evers and Kaul who suffered the effects of the limitations on their respective offices.

Regardless, Evers and Kaul are defendants, not plaintiffs, so any injuries they have suffered are irrelevant to the standing analysis. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one *plaintiff* must have standing to seek each form of relief requested in the complaint." (emphasis added)). Plaintiffs have not moved to dismiss Evers and Kaul as defendants; and Evers and Kaul haven't asked to be realigned as plaintiffs. The case plaintiffs cite had nothing to do with standing. *See Teamsters Local Union No. 727 Health & Welfare Fund v. L & R Grp. of Cos.*, 844 F.3d 649 (7th Cir. 2016). Rather, the court in that case amended the caption to reflect the real name of the party being sued. *Id.* at 652. Plaintiffs cite no authority for the view that a court may consider a defendant's injuries when determining standing or realign the parties to preserve standing without a proper motion.[2]

---

is obviously capable of asserting his or her own rights. Also, the party represents Evers and Kaul as Democrats, not as the governor and attorney general. Because the court has concluded that plaintiffs haven't alleged an injury in fact to Democratic voters, Evers and Kaul's membership in the party provides no help in showing that the party itself has standing to sue.

[2] Realigning the defendants who are part of the executive branch would create a different a problem because the remaining defendants would all be legislators. Even in a lawsuit for injunctive relief, legislators are generally entitled to absolute immunity for any conduct performed in a legislative capacity. *See Reeder v. Madigan*, 780 F.3d 799, 802 (7th Cir. 2015).

Even if the court were to consider Evers and Kaul's injuries, doing so would not save the case for plaintiffs. Plaintiffs' claim under the Guarantee Clause is not justiciable. *See Rucho*, 139 S. Ct. at 2506 ("This Court has several times concluded . . . that the Guarantee Clause does not provide the basis for a justiciable claim."). Plaintiffs contend that *Rucho* isn't dispositive because it didn't expressly disavow a statement in *New York v. United States*, 505 U.S. 144, 185 (1992), that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." But the Court didn't acknowledge any exceptions in *Rucho*, so if plaintiffs believe that the door is still open for presenting a claim under the Guarantee Clause, that is an issue they will have to raise with the Supreme Court. *See Risser*, 930 F.2d at 552 ("The clause guaranteeing to each state a republican form of government has been held not to be justiciable, [and that holding] is too well entrenched to be overturned at our level of the judiciary.").

And the court of appeals has already held that "[a] modest shift of power among elected officials is not a denial of republican government or even a reduction in the amount of democracy." *Id.* at 553. Although plaintiffs may resist a conclusion that the shift of power at issue in this case is "modest," the shift was not more substantial than what was at issue in *Risser*, which was the governor's ability to exercise a partial veto of legislation, a power so broad that it allows him to "delete phrases, words, and digits." *Id.* at 550. Both cases involve "a retail, not a wholesale, reallocation of" state power. *Id.* at 554.

As for plaintiffs' claims under the First Amendment and the Equal Protection Clause, adding Evers and Kaul as defendants wouldn't help because plaintiffs' have framed their claims as violations of the constitutional rights of voters and the Democratic Party, not as violations of the rights of the governor and attorney general. Plaintiffs haven't explained how Acts 369

13

and 370 burden the First Amendment rights of Evers or Kaul or discriminate against them within the meaning of the Equal Protection Clause. Rather, plaintiffs describe Evers and Kaul's injuries as an encroachment by the legislature on the powers of the executive branch. But it is well established that "[t]he Constitution does not prescribe the balance of power among the branches of state government." *Id.* at 552.

**D. Conclusion**

The bottom line is that federal courts don't have the authority under the United States Constitution to police the boundaries between legislative and executive power in state government in the absence of a concrete and particularized harm and the violation of a federal constitutional right. If Evers, Kaul, or anyone else believes that the state legislature has overstepped its lawful authority, the remedy is a lawsuit in state court under the state constitution. *See, e.g., Cooper v. Berger*, 809 S.E.2d 98 (N.C. 2018) (holding that state legislature violated separation of powers doctrine by transferring certain powers from legislative to executive branch during lame-duck session).

ORDER

IT IS ORDERED that the motion for a preliminary injunction, Dkt. 2, is DENIED, and the motion to dismiss, Dkt. 34, is GRANTED on the ground that plaintiffs lack standing to

sue. The case is DISMISSED without prejudice for lack of subject matter jurisdiction. The clerk of court is directed to enter judgment accordingly.

Entered September 30, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge